SECOND DIVISION

No. 1-09-1388

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 06 CR 1204 |
| | ) | |
| EDWIN TOLENTINO, | ) | The Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Karnezis and Connors concurred in the judgment and opinion.

**OPINION**

Defendant, Edwin Tolentino, was convicted after a bench trial of attempted first degree murder of a peace officer, being an armed habitual criminal, and aggravated discharge of a firearm in the shootings of Officer George Junkovic and Patrick Cady. The trial court sentenced Tolentino to 28 years' imprisonment for the attempted first degree murder and a 20-year sentence enhancement for personally discharging a firearm (a total of 48 years), plus two concurrent 20-year terms for the armed habitual criminal and aggravated discharge of a firearm convictions. On appeal, he contends: (1) the trial court improperly applied the 20-year sentence enhancement contrary to the plain language of section 8-4(c) of the Criminal Code OF 1961 (720 ILCS 5/8-4(c) (West 2006)); (2) his conviction of the offense of being an armed habitual criminal violates the *ex post facto* clause of the United States Constitution (U.S. Const. Art. I, §9, cl.3; §10, cl. 1);

No. 1-09-1388

(3) his conviction for aggravated discharge of a firearm violates the one-act, one-crime rule; and

(4) his mittimus should be corrected to reflect 1,083 days' credit for presentence incarceration[1].

For the reasons hereinafter set forth we affirm Tolentino's convictions and 20-year concurrent

sentences for armed habitual criminal and aggravated discharge of a firearm. We affirm

Tolentino's conviction and sentence and remand the case for issuance of a corrected mittimus

reflecting 1,083 days of credit.

## JURISDICTION

The trial court sentenced Tolentino on December 10, 2008, and he filed a timely notice of

appeal on December 10, 2008. Accordingly, this court has jurisdiction pursuant to article VI,

section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing

appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970,

art. VI, §6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

## BACKGROUND

At Tolentino's bench trial, Patrick Cady testified for the State. On December 16, 2005, at

approximately 11:30 p.m., Cady was at a liquor store at North Avenue and Kedzie in Chicago,

Illinois. He was with other Latin King members Gabriel Williams, Edwardo Rodriguez, Samuel

Gonzalez, and Andre Ramos. While Cady was inside the store, Williams and Ramos threw

bottles at the window of a white Oldsmobile Cutlass. Cady was told that Edwin Tolentino, also

---

[1]Although Tolentino in his appellant's brief argued that he was entitled to 1,084 days' credit, the State in its brief argued that he was in fact only entitled to 1,083 days' credit because he incorrectly included the day of sentencing in his calculation. In his reply brief, Tolentino agreed with the State that the mittimus should be corrected to reflect 1,083 days' credit.

2

known as Chiquito, was in the car. The Oldsmobile drove off and the group began walking down North Avenue toward Wabansia when Ramos received a phone call. Ramos put the call on speaker phone. The caller asked the group's location and Ramos told the caller their location. Soon thereafter, someone wearing a ski mask and black jacket came toward the group and started shooting at them. Cady and his companions ran to a friend's apartment at 3221 West North Avenue, and a man in a ski mask also entered the building. The masked man, however, wore a different shirt than the shooter. The man called out "come down here bitch." When Cady heard the person's voice, he believed it was the same person he had heard on the speaker phone. The man fired a shot into the hallway toward the stairwell and left after Cady and the others went inside the apartment.

From the apartment window, Cady saw the man exit the building and walk across North Avenue to Sawyer Street before turning into an alley. A Lincoln with a dark rag top exited the alley, and due to the proximity in time, Cady believed the shooter was in the Lincoln. Police were called to 3221 West North Avenue and Cady spoke to the officers. The officers then left after receiving a call. Cady and his friends also left the apartment and got into a friend's car to follow the police. At Division and Campbell, they saw several police cars and the unoccupied Lincoln with the doors open. Cady later saw Tolentino, without a mask, getting into a paddy wagon.

Officers Alftedo Roman and Joseph Annerino were working with another officer on December 16, 2005. That night, around 11:40 p.m., they were traveling in an unmarked car when they heard a message of a person shot in the area of North and Kedzie. A second message

3

indicated the shooter may be "Chiquito", whom Officer Roman knew from previous encounters. Officer Roman drove to Haddon and Washtenaw, an area frequented by Tolentino and the Spanish Cobras. Officer Roman believed Tolentino was a member of the Spanish Cobras. The officers then spotted a blue Lincoln going west on Haddon, and they pulled behind the car. Although they activated the lights and siren of their unmarked car, the Lincoln did not stop. The Lincoln eventually stopped in a vacant lot at 2509 West Division. Tolentino got out of the car and started running. The officers chased Tolentino, shouting "Stop, police." As he neared the end of the lot, Tolentino threw a weapon to the ground which Officer Annerino retrieved. The weapon was a .25-caliber semiautomatic pistol containing one live round. Officer Annerino then resumed the chase.

Other units soon responded and Officer Junkovic, along with his partners Officers Hurlahy and Morales, joined the chase. When Officers Roman and Junkovic were 6 to 10 feet from Tolentino, they heard him yell, "I have a gun. I'll shoot you" a number of times. Officer Junkovic testified that Tolentino looked right at him when he shouted the statements. Officer Annerino stated that he also heard Tolentino's threats. As a precaution, Officer Junkovic ran on the street parallel to Tolentino so that there were parked cars between them. Officer Junkovic saw Tolentino reach into his waist and pull out a weapon. Tolentino raised the weapon and fired a shot in Officer Junkovic's direction. Officer Roman heard a gunshot and saw a flash. When Tolentino aimed his weapon at Officer Roman, the officer pulled out his .45-caliber service weapon and fired two shots in Tolentino's direction.

Tolentino continued running until he came to a gangway at 2506 West Haddon with a

five- foot to six-foot tall gate. Officer Roman ordered Tolentino to get down, and when Tolentino raised his weapon towards him, Officer Roman fired four more shots. Tolentino then scaled the fence and fell onto the pavement on the other side. He crawled through the yard and Officer Roman lost sight of him. At this point, other officers had responded. Officer Rojas was on the other side of the fence and found Tolentino leaning against a tree or pole. Officer Rojas ordered Tolentino to stop, but Tolentino kept moving until he was out of the officer's sight. Officer Rojas and his partner got permission to go through the building to the backyard, where they found Tolentino under the porch. They ordered Tolentino to come out and when he eventually did, the officers performed an emergency take-down in which Tolentino was taken to the ground and handcuffed. The gun Tolentino used to fire at Officers Junkovic and Roman was not recovered.

Officer Mark Harvey recovered a cell phone and a bullet fragment near the front yard of 2502 West Haddon. A .45-automatic caliber cartridge case was retrieved at 1140 North Campbell, and a .45-caliber shell casing was recovered in the gangway near the front of 2506 West Haddon. Officer Paul Presnell recovered a fired cartridge case and a fired bullet at 3221 West North Avenue. He also observed a hole in the drywall of the stairwell. The parties stipulated that if called to testify, firearms examiner Jennifer Sher would state that she received a .25-caliber Beretta and one unfired bullet. She analyzed this evidence, along with the .25-caliber fired cartridge case recovered from 3221 West North Avenue. In her opinion, the cartridge case and fired bullet came from the .25-caliber weapon. A gunshot residue test (GSR) was performed on Tolentino. Based on the results of that test, Robert Berk, an expert in GSR examination,

5

concluded that Tolentino was either in an environment where a weapon was fired, came into contact with something that had GSR on it, or had fired a weapon.

Detective Robert Cordaro met with Tolentino after his arrest. Tolentino was wearing a brown, hooded sweatshirt, black jacket with blue liner, blue jeans, and one brown boot. Detective Cordaro recovered a ski mask from the jacket pocket. He also photographed a tattoo of "Chiquito" on Tolentino's right leg. A medical technician later took a buccal swab from Tolentino which was sealed and inventoried. Swabs were also taken from the ski mask recovered from his pocket. DNA analyst Christina Caccamo received and performed DNA tests on the swabs. She concluded that the ski mask contained a mixture of the DNA profiles of at least three people, and one of the profiles matched Tolentino's to a reasonable degree of scientific certainty.

For the purpose of the armed habitual criminal charge, the State presented certified copies of Tolentino's conviction for an October 11, 2001, robbery (No. 01 CR 21944) and a May 31, 2005, conviction for delivery of a controlled substance (No. 05 CR 01056-01).

Raphael Polanco, Tolentino's cousin, testified for the defense. He stated that on December 16, 2005, he was driving his Cutlass Supreme on Division at Kedzie when some people threw a bottle and container of mashed potatoes at his car. He stated that Tolentino never drove his car.

Tolentino testified that on December 16, 2005, around 11:30 p.m., he was driving from his mother's house to drop off a friend. As he drove, an unmarked car followed him and started flashing its lights. Unsure whether it was a police car, Tolentino kept driving until he was behind

6

a restaurant. He then jumped out of the car and started running. He knew the car was a police car because they yelled, "police, stop." Tolentino continued running, however, because he had a gun. He threw the gun down in front of the restaurant and, while running, tried to call for help on his cell phone. As Tolentino turned right on Campbell, the officers shot at him even though he was unarmed at the time. He testified that he never fired at anyone that evening.

Tolentino then ran to the gangway and jumped over the gate. When he landed on the other side, he dropped his cell phone. Tolentino stated he could not recall Officer Roman shooting at him in the gangway. He hid under a porch until four officers came and told him to put his hands up. When he came out from under the porch, Officer Roman and another officer grabbed him. Other officers soon arrived and one put his thumbs in Tolentino's eyes while another kicked him in the forehead. Tolentino testified that he had bruises on his head and nose, and his eyes were bleeding.

On cross-examination, Tolentino stated his nickname was "Chiquito" but he was not a Spanish Cobra. His friend, Rico, had given him the .25-caliber gun police recovered from the parking lot. Tolentino also stated that although he had worn the ski mask before, he did not wear it that night. He testified he was not in his cousin's white Cutlass on the night of December 16, 2005. In rebuttal, the State introduced a certified copy of defendant's March 30, 2000, conviction for possession of a controlled substance.

Following closing arguments, the trial court found Tolentino guilty of aggravated discharge of a firearm at Patrick Cady inside the 3221 West North Avenue building, attempted first degree murder of Officer Junkovic and that he personally discharged a firearm at Officer

7

No. 1-09-1388

Junkovic, aggravated discharge of a firearm at Officer Junkovic, and armed habitual criminal.

Tolentino filed a motion for judgment notwithstanding the verdict, or alternatively for a new

trial, which the trial court denied. The trial court sentenced Tolentino to 28 years' imprisonment

for attempted first degree murder, plus "an additional 20 years on that 28 years because you

personally discharged a firearm with the intent to kill a police officer." The aggravated discharge

of a firearm at Officer Junkovic merged. The court then sentenced Tolentino to 20-year

concurrent terms for the aggravated discharge of a firearm at Cady and the offense of armed

habitual criminal. The trial court denied Tolentino's motion to reconsider his sentence.

Defendant filed this timely appeal.

ANALYSIS

The trial court sentenced Tolentino to 28 years' imprisonment for his attempted first

degree murder of a peace officer conviction and added a sentence of 20 years for personally

discharging a firearm for a total of 48 years' imprisonment. Tolentino first contends that the trial

court improperly applied the 20-year sentence enhancement contrary to the plain language of

section 8-4(c) of the Criminal Code. It is well-settled law in Illinois that "[a] sentence which

does not conform to a statutory requirement is void." *People v. Arna* 168 Ill. 2d 107, 113 (1995).

The State argues that defendant has forfeited review of this issue by failing to object at trial and

include the issue in a posttrial motion. A void order, however, may be attacked at any time and

in any court; as such, Tolentino's argument that his 20-year sentence enhancement is void is not

subject to waiver. *People v. Macias*, 371 Ill. App. 3d 632, 643 (2007). Where the issue concerns

the proper application of the statute used to enhance a sentence, it is one of statutory

8

interpretation subject to *de novo* review. *People v. Taylor*, 221 Ill. 2d 157, 162 (2006).

Tolentino argues that section 8-4(c) does not authorize the 20-year sentence enhancement imposed by the trial court below. The relevant portions of the statute are as follows:

"§8-4. Attempt.

(a) Elements of the Offense.

A person commits an attempt when, with the intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense.

\*\*\*

(c) Sentence.

\*\*\*

(1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that

(A) an attempt to commit first degree murder [of a peace officer] \*\*\* is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which

9

the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, is a Class X felony for which 25 years or up to a term of natural life shall be added to the term *** of imprisonment imposed by the court;" 720 ILCS 5/8-4 (West 2006).

Tolentino contends that the plain, unambiguous language of the statute prohibits the application of the firearm enhancement to his attempted first degree murder of a peace officer conviction. In support, Tolentino cites *People v. Douglas*, 371 Ill. App. 3d 21 (2007). The defendant in *Douglas* was convicted of two counts of attempted first degree murder of a peace officer and sentenced to 35 years' imprisonment for each count, to run concurrently. *Douglas*, 371 Ill. App. 3d at 22. On appeal, he sought to reduce his convictions to simple attempted first degree murder and remand for resentencing on the lesser charge. *Douglas*, 371 Ill. App. 3d at 22. The State opposed the contention, but argued that the case should be remanded because defendant's sentence did not contain the mandatory 20-year enhancement for personally discharging a firearm. *Douglas*, 371 Ill. App. 3d at 23.

In *Douglas*, the appellate court discussed the applicability of the sentencing-enhancement

provision at issue in the case before us. *Douglas*, 371 Ill. App. 3d at 26. It noted that the "plain, unambiguous language of "section 8-4(c)(1)(A) regarding the offense of attempted first degree murder of a peace officer makes no reference to a sentence enhancement. *Douglas*, 371 Ill. App. 3d at 26. Instead, the sentence enhancements that are specified in sections 8-4(c)(1)(B), (C), and (D) are for simple attempted murder involving a firearm with each provision being a different offense. *Douglas*, 371 Ill. App. 3d at 26. Regarding section 8-4(c)(1)(A), the court reasoned that "[b]y creating a Class X offense carrying 20 to 80 years, the legislature well might have believed it was authorizing trial judges to impose severe sentences. That is, the sentence already is enhanced, without the need for further provision. Class X offenses ordinarily carry a sentence of 6 to 30 years." *Douglas*, 371 Ill. App. 3d at 26.

The State asks this court to disregard *Douglas* as erroneous. It disagrees that the statute distinguishes attempted first degree murder of a peace officer, and attempted first degree murder by personally discharging a firearm, as separate offenses with mutually exclusive penalties. It contends that if the public policy concerns underlying each provision differ, the penalties for each need not be mutually exclusive. Section 8-4(c)(1)(A) enhances the sentencing range for attempted first degree murder when the victim is a peace officer. The legislators recognized the heightened risk officers take in performing their duties and sought to deter the intentional killings of police officers. See *People v. Henderson*, 354 Ill. App. 3d 8, 18 (2004). On the other hand, section 8-4(c)(1)(C) enhances the sentence for attempted first degree murder by personally discharging a firearm. In enacting this subsection, the legislators sought to deter the use of firearms in the commission of felonies due to the greater risk their use poses to society at large.

11

No. 1-09-1388

*People v. Morgan*, 203 Ill. 2d 470, 488 (2003) *overruled on other grounds by People v. Sharpe,* 216 Ill. 2d 481 (2005).

The State reasons that since the subsections address separate public policy issues, applying both in sentencing does not "run afoul of double enhancement concerns." Furthermore, the statute is silent as to whether subsections (A) and (C) are mutually exclusive. Given the statute's silence on the mutual exclusivity of its provisions, and the fact subsections (A) and (C) may be applied without double enhancement concerns, the State argues *Douglas* was wrongly decided and both subsections (A) and (C) must be applied in sentencing here.

We agree with *Douglas* that subsection (A) contains no sentencing enhancement, and that the sentencing enhancements for attempted murder when a firearm is used are found in subsections (B), (C), and (D). However, the court's statement that the legislature "might have believed" the increased sentencing range contained in subsection (A) represented a built-in enhancement "without need for further provision" is merely speculative *dicta* and we decline to follow it. See *Douglas*, 371 Ill. App. 3d at 26. The main issue in *Douglas* concerned the retroactive application of *People v. Sharpe*, 216 Ill. 2d 481 (2005), to the defendant's sentence. The *Douglas* court briefly discussed the applicability of the firearm enhancements to subsection (A) as a collateral issue, and only at the end of its analysis as an alternative reason for affirming the defendant's sentence. *Douglas*, 371 Ill. App. 3d at 26.

Unlike *Douglas*, the applicability of the firearm enhancement to subsection (A) is a question directly before us. We will not speculate on what the legislature "might have believed." Statutory language is "the most reliable indicator of the legislature's objectives in

12

enacting a particular law." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). The statute here does not expressly prohibit use of the firearm enhancements when sentencing under subsection (A). Furthermore, as the State points out, the public policy concerns underlying subsection (A) differ from concerns underlying firearm enhancement provisions. The primary rule of statutory construction is to give effect to legislative intent. *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 507 (2003). Allowing a trial court to add a firearm enhancement to a sentence given pursuant to subsection (A) would address the legislature's desire both to deter intentional killings of peace officers and to discourage the use of firearms in the commission of felonies. Accordingly, the trial court did not err in applying the firearm enhancement to Tolentino's sentence.

Next, Tolentino argues that his conviction of armed habitual criminal violates the *ex post facto* clauses of the United States and Illinois constitutions. See Ill. Const. 1970, art. I §16; U.S. Const. Art. I, §9, cl. #3; §10, cl. 1. A statute is presumed constitutional, and the party challenging it bears the burden of proving the statute unconstitutional. *People v. Malchow*, 193 Ill. 2d 413, 418 (2000). Courts must "construe acts of the legislature so as to uphold their constitutionality and validity if it can reasonably be done" and resolve any ambiguities contained therein in favor of validity. *People v. Inghram*, 118 Ill. 2d 140, 146 (1987). Whether a statute is constitutional is a question of law reviewed *de novo*. *Malchow*, 193 Ill. 2d at 418.

"An *ex post facto* law is one that (1) makes criminal and punishable an act innocent when done; (2) aggravates a crime, or makes it greater than it was when committed; (3) increases the punishment for a crime and applies the increases to crimes committed before the enactment of

13

the law; or (4) alters the rules of evidence to require less or different evidence than required when the crime was committed." *People v. Leonard*, 391 Ill. App. 3d 926, 931 (2009). The prohibition against *ex post facto* laws stems from "a person's right to have fair warning of conduct giving rise to criminal penalties and punishment." *Leonard*, 391 Ill. App. 3d at 931.

Tolentino was convicted of the offense of armed habitual criminal. Section 24-1.7(a) of the Criminal Code states:

> "(a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:
>
> > (1) a forcible felony as defined in Section 2-8 of this Code;
> >
> > (2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery with a firearm; or
> >
> > (3) any violation of the Illinois Controlled Substances Act or the Cannibis Control Act that is punishable as a Class 3 felony or higher." 720 ILCS 5/24-1.7(a) (West 2006).

The effective date of this statute was August 2, 2005.

Tolentino committed the offense of armed habitual criminal on December 16, 2005, by possessing a firearm. The State also presented certified copies of Tolentino's convictions for the qualifying offenses of robbery committed on October 11, 2001, and delivery of a controlled

substance committed on May 31, 2005. Tolentino argues that application of the armed habitual criminal statute to him violates the prohibition against *ex post facto* laws since his prior convictions, which occurred before the enactment of the statute, were elements of the armed habitual criminal offense.

In *Leonard*, Finis Leonard was convicted of the offense of armed habitual criminal for possessing a firearm after having previously been convicted of three qualifying offenses committed between 1998 and 2004. *Leonard*, 391 Ill. App. 3d at 927. Like Tolentino, Leonard argued that the armed habitual criminal statute violated the provision against *ex post facto* laws because his prior convictions were used as elements of the offense even though they occurred before the enactment of the statute. *Leonard*, 391 Ill. App. 3d at 930. The court found no *ex post facto* violation, holding that the armed habitual criminal statute did not punish Leonard for offenses he committed before the statute was enacted, but instead punished him for "the new act of possessing a firearm." *Leonard*, 391 Ill. App. 3d at 932. Furthermore, he had fair warning at the time he possessed the firearm "that, in combination with his prior convictions, he was committing the offense of armed habitual criminal." *Leonard*, 391 Ill. App. 3d at 931-32.

In *People v. Bailey*, 396 Ill. App. 3d 459, 463 (2009), the court cited approvingly to *Leonard*'s holding and analysis. Marcus Bailey was convicted under the armed habitual criminal statute for possessing firearms in 2006 after having previously been convicted of two qualifying offenses in 1997. *Bailey*, 396 Ill. App. 3d at 461. Bailey contended that the armed habitual criminal statute violated the provision against *ex post facto* laws because his prior convictions occurred before the enactment of the statute. *Bailey*, 396 Ill. App. 3d at 461-62. Citing to

15

*Leonard*, the court in *Bailey* held that the statute "created a substantive offense that punishes a defendant, not for his earlier convictions, but for the new offense created therein." *Bailey*, 396 Ill. App. 3d at 464. Accordingly, the court held that the armed habitual criminal statute did not violate *ex post facto* prohibitions. *Bailey*, 396 Ill. App. 3d at 464.

Tolentino's possession of a firearm occurred on December 15, 2005, after the effective date of the armed habitual criminal statute. Therefore, he had fair warning that, in combination with his prior convictions for robbery and delivery of a controlled substance, he was committing the offense of armed habitual criminal. We adhere to the well-reasoned decisions in *Leonard* and *Bailey* and hold that the armed habitual criminal statute does not violate constitutional prohibitions against *ex post facto* legislation.

Tolentino argues that this court should disregard *Leonard* and *Bailey* as cases decided in contravention of *People v. Dunigan*, 165 Ill. 2d 235 (1995), and *People v. Levin*, 157 Ill. 2d 138 (1993). He argues that the supreme court in *Dunigan* and *Levin* upheld the constitutionality of a different statute, the Habitual Criminal Act (the Act) (Ill. Rev. Stat. 1989, ch. 38, par. 33B-1 (repealed by Pub. Act 95-1052 §93 (eff. July 1, 2009))), because prior convictions under that statute were used as sentencing factors only, and did not constitute elements of a new substantive offense. If the statute had considered the prior convictions as elements of a new offense, Tolentino contends, the supreme court would have found an *ex post facto* violation.

We are not persuaded by Tolentino's argument. Unlike the armed habitual criminal statute here, the Act at issue in *Dunigan* and *Levin* deals only with sentencing. The Habitual Criminal Act "mandates the imposition of a natural-life sentence on a defendant convicted of

16

three temporally separate Class X offenses *** within a 20-year period." *People v. Palmer*, 218 Ill. 2d 148, 154-55 (2006), *overruled on other grounds by People v. Petrenko*, 237 Ill. 2d 490 (2010). The supreme court in *Dunigan* and *Levin* responded to the defendants' argument that the Act improperly mandated a life sentence as punishment for all the felony offenses, including the ones for which they had already been convicted, and as such created a new substantive criminal offense. *Dunigan*, 165 Ill. 2d at 241-42; *Levin*, 157 Ill. 2d at 149. The supreme court disagreed with the defendants' argument, stating:

> "The punishment imposed under the Act is for the most recent offense only. The penalty is made heavier because the person convicted is a habitual criminal. The Act does not punish a defendant again for his prior felony convictions, nor are those convictions elements of the most recent felony offense. Instead, they simply aggravate or enhance the penalty imposed for the third and most recent offense." *Dunigan*, 165 Ill. 2d at 242.

The decisions in *Dunigan* and *Levin* do not expressly prohibit the use of prior convictions as elements of an offense in all habitual criminal legislation. Instead, "they merely indicated that the statute in question in those cases was a sentencing enhancement, not a substantive offense. [Citations]. In contrast, the armed habitual criminal statute [at issue here]*** creates a substantive offense which punishes a defendant, not for his or her earlier convictions, but for the new offense." *Leonard*, 391 Ill. App. 3d at 932. We agree with the reasoning of the *Leonard* and *Bailey* courts, and find Tolentino's argument unavailing.

Tolentino next contends that his conviction for aggravated discharge of a firearm violates

17

No. 1-09-1388

the one-act, one-crime rule. The State contends Tolentino forfeited this issue on appeal by failing to object at trial and include it in a posttrial motion. The supreme court, however, has determined that a forfeited claim alleging a one-act, one-crime violation affects the integrity of the judicial process and may be reviewed as plain error. *People v. Harvey*, 211 Ill. 2d 368, 377 (2004). The question of whether Tolentino's convictions violate the one-act, one-crime rule is reviewed *de novo*. *People v. Artis*, 232 Ill. 2d 156, 161 (2009).

Multiple convictions improperly prejudice a defendant if they are based on the same physical act. *People v. King*, 66 Ill. 2d 551, 566 (1977). An "act" is "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. However, if more than one offense stems from "incidental or closely related acts" and the offenses are not lesser included offenses, multiple convictions with concurrent sentences may stand. *King*, 66 Ill. 2d at 566; *People v. Rodriguez,* 169 Ill. 2d 183, 186 (1996). Tolentino argues that his convictions violate the one-act, one-crime rule because the court convicted and sentenced him on three separate charges based on the possession of two handguns. He contends that "the same act of possessing a [particular] firearm gave rise to [his] convictions for armed habitual criminal and either attempt first degree murder of peace Officer Junkovic or aggravated discharge of a firearm at Patrick Cady."

We first determine whether Tolentino's convictions are based on the same physical act. The following are portions of the relevant statutes:

> "A person commits the offense of being an armed habitual criminal if he *** possesses *** any firearm *after having been convicted"* of at least two other

18

*qualifying offenses*.  (Emphasis added).  720 ILCS 5/24-1.7 (West 2006).

"A person commits an attempt when, with intent to commit a specific offense, he *does any act which constitutes a substantial step toward the commission of that offense*."  (Emphasis added).  720 ILCS 5/8-4 (West 2006).

"A person commits aggravated discharge of a firearm when he or she *knowingly or intentionally \*\*\* [d]ischarges a firearm \*\*\*.*"  (Emphasis added).  720 ILCS 5/24-1.2(a)(1) (West 2006).

Although Tolentino's convictions have possession of a firearm as a common element, the mere act of possessing a firearm is not sufficient to convict him of all of the charges.  His convictions for attempted first degree murder of a peace officer and aggravated discharge of a firearm also require proof of separate and distinct acts in addition to the possession of a firearm.  Thus, Tolentino's convictions were not improperly based on a single physical act.

Multiple convictions based on multiple acts, however, are improper if any of the offenses are lesser included offenses.  *Rodriguez*, 169 Ill. 2d at 186.  The supreme court in *People v. Miller*, 238 Ill. 2d 161 (2010), discussed the three methods generally used to determine whether any offenses are lesser included offenses.  It noted that the evidence or facts approach was the most lenient, where a court looks to the evidence presented at trial and determines "whether proof of the greater offense necessarily established the lesser offense."  *Miller*, 238 Ill. 2d at 167.  Under the charging instrument approach, the court looks at the charging instrument to ascertain

whether the greater offense described within contains a "broad foundation" or "main outline" of the lesser offense. *Miller*, 238 Ill. 2d at 166-67 (quoting *People v. Kolton*, 219 Ill. 2d 353, 361 (2006)).

Finally the court examined the abstract elements approach, which compares the statutory elements of the offenses charged. If the comparison reveals that "all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *Miller*, 238 Ill. 2d at 166. This method is the "strictest approach" since it requires a court to find that it is impossible to commit the greater offense without also committing the lesser offense. *Miller*, 238 Ill. 2d at 166. The supreme court held that the abstract elements approach is the correct method to use when a defendant is charged with multiple offenses, and the issue is whether one offense is a lesser-included offense. *Miller*, 238 Ill. 2d at 173.

Comparison of the statutory elements of the offenses at issue here indicates that none are lesser included offenses. Each offense requires proof of distinct acts not necessary to prove the other offenses. Therefore, the trial court properly convicted Tolentino of attempted first degree murder of Officer Junkovic, aggravated discharge of a firearm at Patrick Cady, and the offense of being an armed habitual criminal, as none are lesser included offenses.

Cases cited by Tolentino to the contrary are distinguishable. In *People v. Beltran*, 327 Ill. App. 3d 685, 693 (2002), the court determined the issue using the charging instrument approach rather than the abstract elements approach required by the supreme court in *Miller*. In *People v. Quinones*, 362 Ill. App. 3d 385, 397 (2005), the defendant had two convictions for unlawful use

of a weapon; one based on his possession of an uncased, accessible, loaded firearm and the other based on his possession of the weapon without a valid firearm owner's identification card. *Quinones*, 362 Ill. App. 3d at 397. There, the defendant's convictions for the offenses were actually based on the single physical act of possessing a firearm. *Quinones*, 362 Ill. App. 3d at 397. As discussed above, Tolentino was properly convicted and sentenced on all three convictions because they were based on multiple acts, and none of the offenses were lesser included offenses.

Both Tolentino and the State agree that the mittimus should be corrected to reflect 1,083 days of credit for time served in presentence custody.

CONCLUSION

For the foregoing reasons, we affirm Tolentino's convictions and sentences for attempted first degree murder of a peace officer, aggravated discharge of a firearm at Cady, and the offense of being an armed habitual criminal. We remand the cause so that the mittimus can be corrected to reflect 1,083 days' of credit.

Affirmed; cause remanded for proceedings consistent with this opinion.

---

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

THE PEOPLE OF THE STATE OF ILLINOIS,

      *Plaintiff-Appellee,*

    v.

EDWIN TOLENTINO,

      *Defendant-Appellant.*

---

No. 1-09-1388

Appellate Court of Illinois
First District, Second Division

May 10, 2011

---

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Karnezis and Connors concurred in the judgment and opinion.

---

Appeal from the Circuit Court of Cook County.

The Honorable Thomas V. Gainer, Jr., Judge Presiding.

---

Michael J. Pelletier, State Appellate Defender, Office of the State Appellate Defender, 203 North LaSalle Street, 24th Floor, Chicago, IL 60601, (Patricia Unsinn and Erin E. G. McFeron, of counsel) for APPELLANT.

Anita Alvarez, State's Attorney, County of Cook, Room 309, Richard J. Daley Center, Chicago, IL 60602, (Alan J. Spellberg, Susan R. Schierl Sullivan and Kathryn A. Schierl, of counsel), for APPELLEE.

---