# Illinois Official Reports

## Appellate Court

---

### *People v. Phagan*, 2019 IL App (1st) 153031

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRELL PHAGAN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-3031 |
| Filed<br>Supplemental and modified opinion upon denial of rehearing filed | April 30, 2019<br><br><br><br>July 16, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-CR-17961, 11-CR-17962; the Hon. Mary M. Brosnahan, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Nina Kelly, Assistant State's Attorneys, of counsel), for the People. |

Panel                    JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1        Shortly after Terrell Phagan had stolen a green van at gunpoint, he tried to elude Chicago and Illinois State Police officers during an 11-mile chase through the streets of Chicago. During the officers' pursuit, Phagan shot at them several times. Eventually, officers arrested Phagan after pinning the van between one of their cars and a pole.

¶ 2        The State brought two cases against Phagan. In No. 11 CR 17961, the State charged Phagan with offenses related to the car chase and his use of a gun against the officers. In No. 11 CR 17962, the State charged Phagan with offenses relating to his theft of the van and his use of a gun. The trial court joined the cases for a jury trial.

¶ 3        In case number 17961, the jury found Phagan guilty of two counts of aggravated discharge of a firearm and two counts of attempted murder of a peace officer. The trial court merged the aggravated discharge counts into the attempted murder counts and sentenced Phagan to two concurrent terms of 50 years. That sentence consisted of a 30-year base sentence for the attempted murder of a peace officer coupled with a 20-year firearm add-on. See 720 ILCS 5/8-4(c)(1)(A), (C) (West 2014).

¶ 4        In case number 17962, the jury found Phagan guilty of armed robbery, aggravated vehicular hijacking, and aggravated possession of a stolen motor vehicle. The trial court imposed concurrent 21-year sentences for each of the three offenses.

¶ 5        The trial court then ordered the concurrent 50-year sentences from one case and concurrent 21-year sentences from the other to run consecutively, bringing Phagan's sentence to a total of 71 years.

¶ 6        Phagan's brief contains no argument that the State failed to prove him guilty beyond a reasonable doubt, and at oral argument his counsel confirmed that he is not challenging the sufficiency of the evidence against him. But he raises four arguments about the fairness of the trial proceedings and sentencing: (i) the State made a series of improper arguments in closing statements and rebuttal that deprived him of a fair trial; (ii) the 20-year firearm enhancement does not apply to attempted murder of a peace officer; (iii) the trial court erred by imposing discretionary consecutive sentences; and (iv) Phagan's 71-year sentence is excessive.

¶ 7        We find no error in the conduct of closing arguments or in the imposing of consecutive sentences. We do, however, find error in applying both the 20-year firearm enhancement and the enhanced sentencing range for attempted murder of a peace officer and vacate the 20-year firearm enhancement. We do not fault the trial judge, who followed published decisions from this district in arriving at her decision. But on *de novo* review of the statutory text, we disagree with the decisions of our court for reasons we explain. We vacate the 20-year firearm enhancement but otherwise affirm Phagan's conviction and sentence.

¶ 8 Background

¶ 9 At about 2 a.m. on October 10, 2011, Anthony Wilson was at his aunt's house waiting for his child's mother to arrive. He was in the driver's seat of a green 1999 Chevrolet Savannah van, talking through the window with a friend. A gray Chevrolet Malibu drove up on the driver's side and "asked did [they] have any loud," a term used for marijuana. Wilson told the passenger of the Malibu that he had no marijuana, and the Malibu drove away, turning left onto South Normal Avenue.

¶ 10 Wilson's friend left to go across the street to his house, and the gray Malibu returned. The same man who had asked about the marijuana got out, walked up to Wilson's window, and pointed "like a silver .38 or .357" revolver at him. While Wilson was still seated in the van, the man took about $100 and Wilson's debit card. Wilson identified Phagan in court as that man.

¶ 11 Phagan then told Wilson to get out, which he did. The driver of the Malibu started looking through the van. Phagan told Wilson to open up the back, revealing six speaker boxes that "covered up the back, back door." After seeing the speakers, Phagan told Wilson to "go on down the street," and Wilson ran four or five houses down as he "hollered [his] cousin's name" so that someone would come outside. As he ran he heard a gunshot, saw a flash from a gun in Phagan's direction, and heard "a ding" of metal hit the gate of a fence nearby.

¶ 12 Wilson saw Phagan and the driver get back in the Malibu, so he started to run back to his van. But the Malibu made a U-turn toward the van, and Wilson ran to his friend's house, where he hid behind some bushes. Wilson watched Phagan get out of the Malibu and into his van, driving up Normal and turning onto 100th Street. Wilson called the police.

¶ 13 Chicago police officers Sean Carroll and Michael Pantano, on patrol nearby in an unmarked car, received a call for a "robbery in progress that was reading like a carjacking." On their way to the call, they saw the van and Malibu described by the dispatcher. The officers followed both onto the entrance ramp of Interstate 57 located at 99th Street and Halsted Street. The van and Malibu took the split toward Interstate 94 heading to Indiana; they were traveling next to each other going 15 to 20 miles per hour below the speed limit. Eventually, the officers activated their emergency lights, and both the van and the Malibu pulled over.

¶ 14 Officer Carroll got out of the car, and as soon as he set foot on the pavement, both the van and the Malibu drove away. The Malibu continued on I-94, and the van took the feeder ramp off I-94 onto Stony Island Avenue. The officers stayed with the van. At the intersection of Stony Island and 95th Street the van attempted a U-turn. As the van turned, Carroll could see the driver and identified him in court as Phagan. The van then headed back toward I-94, and Carroll saw "an object which appeared to be a gun come out of the driver's side window of the van pointing directly back at [their] patrol vehicle." Carroll heard "two loud pop sounds, which [he] associated with—as being shots fired." Concrete shot up into the air, which Carroll believed was a result of a bullet impacting the street.

¶ 15 Carroll and Pantano followed the van back onto I-94 toward downtown. At about 87th Street, Carroll saw the back driver's side window of the van shatter "with the sound of a loud pop." He was able to see the driver's right hand "come back up towards the front of the [van] holding what appeared to be the gun." The officers continued following the van as it exited I-94 at 71st Street. Other responding officers joined Carroll and Pantano. Carroll and Pantano maintained their position as the lead pursuit car, zig-zagging through the streets of Chicago heading in a generally northeast direction. Carroll and Pantano eventually lost sight of the van

- 3 -

near the intersection of Pershing Road (39th Street) and Vincennes Avenue. Neither Carroll nor Pantano fired their weapons.

¶ 16    Sergeant James Walsh, who had arrived at Pershing and Vincennes, watched the chase unfold and saw "the individual in the van stick his arm out" holding what appeared to be a weapon. Walsh fired twice at the driver, who was the only person he could see in the van, causing the van to move around him to head east on Pershing.

¶ 17    Chicago police officers Steve Jarosz and Ryan Harty also monitored the progress of the chase on the radio; they relocated to 38th Place and Vincennes and saw police cars following a green van. Eventually, at about 38th Place and Langley Avenue, Jarosz and Harty took over as lead car. At the time they were able to see that someone was in the driver's seat, but not the individual's face.

¶ 18    While Jarosz and Harty were still on Langley, "[a]t that point, it was one shot, and that shot, just by [Jarsoz's] experience, and the echo came right at [them], at [their] car, above [their] car. [Jarosz] didn't know where the shot went, but that's what happened, and the car continued *** southbound on Langley." Jarosz could tell that the shot came from directly in front of them and could not see any cars other than the van. Jarosz heard shots from other directions. The van turned east onto Pershing, and Jarosz and Harty pulled back from their pursuit. Neither officer fired.

¶ 19    Officer Jaysen Orkowski had been parked directly across a small grassy area from where Jarosz and Harty joined the chase. He saw the van turn south onto Langley from 38th Place, and his partner "floored it" to try to intercept the van. Orkowski saw the driver "stick out a gun," a silver revolver, over his left shoulder pointing it at the car behind the van. Orkowski fired three times, but the van did not stop. Orkowski and his partner, while not the lead car, joined the chase as the van turned east onto Pershing.

¶ 20    Officers Eric Taylor and Ayokunle Akinbusuyi arrived at the intersection of Pershing and Langley. Taylor and Akinbusuyi started to turn north onto Langley when Taylor saw the driver in the van "reach over out of the window" with what appeared to be a gun and heard what he believed to be a gunshot. Taylor and Akinbusuyi backed up onto Pershing; the van started driving toward them. Taylor saw the van's driver reach his arm toward an open window "and [he] believe[d] [he] heard a gunshot." Despite Taylor firing six shots and Akinbusuyi firing three to five shots, the van did not stop and continued east on Pershing.

¶ 21    The van reached 750 East Pershing, where Sergeant James Walsh was parked. Walsh heard "a large amount of gunfire" and saw the van coming toward him "a matter of seconds" later. Walsh also fired into the van, but the van did not stop.

¶ 22    Less than a block away, Officer Angelo New and his partner had arrived at the intersection of Pershing and Cottage Grove Avenue. After hearing "multiple gunshots to the west," New saw the van driving toward him at a "high rate of speed." New fired one round from his gun into the van, which caused the driver to almost lose control but ultimately did not deter him. New watched as the van and "a barrage of police cars" continued driving east.

¶ 23    Lieutenant Christopher Kapa, who had been parked next to New and his partner, took over as the lead pursuit car. The van went from Pershing onto Lake Shore Drive, eventually taking the exit for the Interstate 55 ramp going west. Instead of continuing on the interstate, the van exited at State Street, turning south. After zig-zagging from State Street, to 26th Street, to

Martin Luther King Jr. Drive, to 29th Street, the van eventually came to a stop in a parking lot at 3001 S. Vernon Avenue.

¶ 24    Officer Pablo Mariano's vehicle, driven by Sergeant Lopez, had become the lead pursuer at about 31st Street and Lake Shore Drive. As the van exited I-55 at State Street, he saw the driver "motion[ ] several times with his right hand an object, chrome object, which he was driving, he was attempting to aim at us several times." Mariano fired twice at the van to no avail. As the van turned from 26th Street onto Martin Luther King Jr. Drive, Lopez attempted to bump it with his car. The van wobbled but continued to the S. Vernon parking lot, where Lopez bumped the van again, this time wedging it between his car and a pole. Lopez testified that he pulled Phagan out of the driver's seat and placed him under arrest.

¶ 25    Chicago police forensic investigator Carl Brasic arrived at the scene and collected evidence from the interior of the van. He recovered "a six-inch barreled 357-magnum revolver on the floor of the driver's seat." Five of the six bullets had been fired. Brasic also swabbed the gun for DNA. The parties stipulated that Illinois State Police forensic analyst Ryan Paulsen would testify that the DNA on the revolver was a mix of at least two people but was "potentially incomplete and not suitable for comparison."

¶ 26    Through a combination of testimony and stipulations, the record indicates that (i) no fingerprints suitable for comparison were found on the cartridge casings from the revolver in the van; (ii) DNA swabs from inside the van revealed a mixture of at least three people and one profile from which Phagan could be excluded; (iii) gunshot residue (GSR) tests of Phagan's hands indicated that he "may not have discharged a firearm" and, if he did, "then the particles were removed by activity, not deposited, or not detected"; (iv) the GSR test to the front driver area of the van indicated that the area had come into contact with GSR or was in the environment of a discharged firearm; and (v) officers recovered two shirts from Phagan, one of which was negative for GSR and one of which had GSR particles in the shirt's upper area. (The presence of GSR does not necessarily mean that a person fired a gun.)

¶ 27    Forensic analysis also went to each location on the route of the chase where officers had fired their guns. In total, at least 18 cartridge casings and bullets were traced to the various officers' firearms. Of those, five bullets were found in the van. Four were conclusively linked to officer firearms, and one was consistent with a 9 millimeter/.38 caliber, but could not be definitely traced to an officer's gun.

¶ 28    Phagan testified in his own defense. He explained that he was in the area of 10010 South Normal at about 2 a.m. on October 10, 2011, to buy a McDonald's Monopoly game piece from a man he knew only as "Black Boy." Black Boy had arranged the purchase of the highly coveted Boardwalk playing piece from an unknown woman for $2500 to $3500. Phagan arrived in the gray Malibu with his friend Jay, but the woman had not yet appeared.

¶ 29    After being told to wait for 20 to 30 minutes, Jay started playing dice with the five or six other men that were gathered there, including Anthony Wilson. After Jay won some money and it became apparent that the woman with the Monopoly piece was not coming, Phagan and Jay tried to leave. One of the men, apparently disgruntled over Jay's success at dice, told them they could not leave, pulled out a gun, and held it to Phagan.

¶ 30    Phagan was able to push the man with the gun away and run behind a car. As soon as Phagan pushed him, the man fired a shot. As Phagan hid, he heard tires screeching and saw the gray Malibu drive away. Thinking Jay had left him, Phagan got into the green van because he "felt like it was [his] only way off the block." As Phagan attempted to maneuver the van, he

heard another shot, and the passenger window blew out. Phagan was able to put the van into drive when the man with the gun came up to the passenger side, put his arm in the van, and fired the gun again.

¶ 31     Phagan pulled onto 100th Street and saw the gray Malibu parked there, Jay in the driver's seat. They both drove off and eventually made it to the expressway where they were pulled over by the police. After one of the officers got out of the police car, Phagan drove off again. Asked to explain why he fled from police he said: "I was thinking when I had pulled off the block when the guy stuck his arm in the window and I heard a thump, I thought I had ran, like, maybe his leg over or something ***. So when I was on the expressway and the police pulled me over, I'm thinking, like, okay, I don't want to go back to jail." Phagan explained that, during the time the police were chasing him, he was able to hear sirens and "some shots" but he did not remember most of the chase. Phagan denied ever shooting at the officers and testified that the gun found in the van was the same gun that the man had used to shoot at him back on South Normal.

¶ 32     During closing arguments, while discussing the firearm evidence collected, the State argued: "The Defendant is literally caught at 3001 South King in the stolen vehicle with a smoking gun." Defense counsel objected, and the court overruled him. Defense counsel then presented his closing argument to the jury, repeatedly arguing that the officers have "got to be justified taking 25 shots at the van." Counsel argued that many of the officers' explanations about hearing gunshots from the van were to "justify [the officers'] actions" because "when they're [*sic*] shots fired, and the officers get into position pretty much have a green light to fire shots and that's what it comes down to." In rebuttal, the State argued that it did not matter that there were minor inconsistencies in some of the officers' testimony because "[w]ouldn't it be suspect if it was all exactly the same, if everybody saw the same thing[?] They're just doing their job. They're out there serving and protecting. We ask them to do that. We need the police." Again, defense counsel objected, and the trial court overruled his objection. Finally, in regard to Phagan's testimony, the State argued in rebuttal: "Again make absolutely no mistake about it. It's ridiculous what he told you. Don't believe it for a second. He has so much to lose. That's why he's doing it." Again, the trial court overruled defense counsel's objection.

¶ 33     In case number 17961, the jury found Phagan guilty of attempted first degree murder of Officers Carroll and Pantano. The jury also found, in response to a special jury question, that the State had proved that Phagan personally discharged a firearm during each of those offenses. The jury also found Phagan guilty of two counts of aggravated discharge of a firearm, again as to Officers Carroll and Pantano.

¶ 34     In case number 17962, the jury found Phagan guilty of armed robbery and aggravated vehicular hijacking of Anthony Wilson, but the jury found that the State had not proven that Phagan personally discharged a firearm during those offenses. The jury also found Phagan guilty of aggravated possession of a stolen motor vehicle.

¶ 35     In a motion for a new trial, Phagan reasserted the argument that he had made before trial that it was error to allow the State to seek enhancements for attempted murder based on both the status of the victims as peace officers and the discharge of a firearm. The motion also argued that the State improperly referred to a "smoking gun" during its closing argument and improperly bolstered the credibility of the police officers' testimony during rebuttal. The motion made no mention of defense counsel's objection to the State's comments about Phagan's testimony. After hearing argument, the court denied the motion.

¶ 36 At sentencing, Phagan's mother testified that she and Phagan's grandmother had shared the responsibility of raising him. Phagan had made it to eighth grade and then dropped out. He worked for his uncle doing landscaping for about two-and-a-half years. At the end, she asked the judge to be lenient because "Terrell made a mistake, and I think we are all entitled to make a mistake."

¶ 37 The State, in aggravation, called Detective Grossman from the Sauk Village Police Department. He testified that in July of 2008, he went to a gas station in response to a call about a stolen vehicle in the parking lot. When he got there, he tried to get the two occupants out of the car, but they refused and drove off. The driver drove erratically, including through construction zones, sometimes at speeds "[i]n excess of 110 miles an hour." The passenger leaned out and fired a gun at the officer, causing him to lose control of his car and crash. The second police car also eventually dropped out of the pursuit. Officers found the stolen car abandoned in Chicago. After Phagan was arrested, he admitted to officers that he had been the driver of the fleeing car and knew that it had been stolen. Phagan also admitted that he knew the passenger had a gun.

¶ 38 Referring to Phagan's 2008 case, the court considered it "eerily similar to the one here before the court" and noted that Phagan had been on parole for that offense when he committed this one. And the court could not say that Phagan's conduct would be unlikely to recur. Accordingly, the trial court found that Phagan's behavior put "countless people" in harm's way and that Phagan made "decision after decision" to keep going even though he could have stopped at any time.

¶ 39 In case number 17961, the court imposed a 50-year sentence on each count of attempted first degree murder. Each sentence consisted of 30 years for the attempted murder of a peace officer plus a 20-year firearm enhancement for Phagan's personal discharge of a firearm. The court ordered each 50-year sentence to run concurrently. The court previously had merged the aggravated discharge offenses into the attempted murder offenses.

¶ 40 In case number 17962, for each of the three offenses on which the trial court found Phagan guilty, the court imposed a 21-year sentence to run concurrently.

¶ 41 The trial court found that "[Phagan's] actions ha[ve] put countless individuals in danger, both from what occurred in 2008 and certainly with the continuing course of criminal conduct in this case. So it is the court's view that consecutive sentences in this case are required to protect the public from further criminal conduct by the defendant." The court ordered the 50-year sentence in case number 17961 to run consecutively to the 21-year sentence in case number 17962, leading to a total sentence of 71 years in the Department of Corrections. Phagan's motion to reconsider sentence was denied.

¶ 42            Analysis

¶ 43         Prosecutorial Misconduct

¶ 44 Phagan takes issue with three statements the prosecutor made during closing arguments. He claims that the State misstated the evidence when it argued "[t]he Defendant is literally caught at 3001 South King Drive in the stolen vehicle with the smoking gun." He claims that the State, in rebuttal, improperly vouched for its police officer witnesses when it argued "[t]hey're just doing their job. They're out there serving and protecting. We ask them to do that. We need the police." Finally, he claims that the State improperly disparaged his own

testimony when it argued "it's ridiculous what [Phagan] told you. Don't believe it for a second. He has so much to lose. That's why he's doing it."

¶ 45 The State contends that all of its closing arguments were proper and any error would be deemed harmless. As to the "smoking gun" argument, the State asserts that the term was used figuratively and was supported by the evidence because Phagan was found with a gun after officers saw him fire one. As to Phagan's bolstering claim, the prosecutor was simply stating common knowledge supported by the facts and in response to defense counsel's argument implying that the officers had lied to justify their actions. Finally, as to Phagan's claim that the State disparaged his testimony, the State initially argues that Phagan forfeited the claim by not including it in Phagan's posttrial motion; on the merits, the State contends commenting on a defendant's credibility is fair game and material inconsistencies in the testimony supported the comments.

¶ 46                                    Standard of Review

¶ 47 Both parties acknowledge that there is a "conflict" or "split in authority" surrounding the standard of review for claims of prosecutorial misconduct in closing argument. In 2007, the Illinois Supreme Court said, "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). Before that, our supreme court had said "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *People v. Blue*, 189 Ill. 2d 99, 128 (2000). These seemingly contradictory statements have led to differences of opinion among the appellate court districts as to which decision controls. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 80 (collecting cases).

¶ 48 Phagan argues that under any standard of review the prosecutor's arguments constitute error. The State argues that any errors were harmless and asks us to adopt an abuse of discretion standard to review the initial question of whether there was error at all. We agree that the abuse of discretion standard is the correct one and join the decisions of other courts that have held similarly. *E.g.*, *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (2008); *People v. Love*, 377 Ill. App. 3d 306, 313 (2007).

¶ 49 Because both *Blue* (abuse of discretion) and *Wheeler* (*de novo*) are decisions from our supreme court, we must explain our decision to choose one over the other. It cannot be understated that, in the context of alleged impropriety in argument, the pedigree for an abuse of discretion standard spans more than a hundred years. *E.g.*, *People v. McCann*, 247 Ill. 130, 170-71 (1910); *Bulliner v. People*, 95 Ill. 394, 405-06 (1880). Of the many cases decided around the turn of the twentieth century, *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486 (1892), provides one of the most comprehensive accounts of the reasons courts apply the abuse of discretion standard in this context. We note that *Cotton* was a civil case but has since been incorporated by citation into many criminal decisions. *E.g.*, *People v. Smothers*, 55 Ill. 2d 172, 176 (1973).

¶ 50 The court in *Cotton*, adopting an abuse of discretion standard, focused on the presence of the trial judge during the entirety of the proceedings. 140 Ill. at 502. Because the trial judge is present for the entire trial, he or she has the benefit of "hearing the remarks of counsel on both sides" and is better situated to determine whether anything that happened or was said justifies

the challenged remark. *Id.* "Every reasonable presumption must be indulged in that the trial judge has performed his [or her] duty, and has properly exercised the discretion vested in him [or her] ***." *Id.* at 503. We add to *Cotton*'s observations that the trial judge is also in a superior position to observe the tone of the advocates, the apparent impression of the remarks on the jurors, and the rhetorical impact that a passing remark may or may not have had in the broader context of counsel's entire argument. As judges of a reviewing court, the "dry" record provides us with none of these benefits.

¶ 51　　A claim that a *de novo* standard of review applies does not enjoy similar historical support. In *Wheeler*, 226 Ill. 2d at 121, our supreme court pointed to *People v. Graham*, 206 Ill. 2d 465 (2003), as authority for announcing a *de novo* standard of review. But, as precedents go, *Graham* is far from helpful. There, the defendant claimed both that he had been denied a fair trial because the State elicited testimony about his postarrest silence at trial *and* that the prosecutor erred in bringing that silence up during closing arguments. *Id.* at 474. The court then said, "We review this legal issue *de novo*," making no differentiation between the distinct claims the defendant had raised. *Id.*

¶ 52　　That would be confusing enough, but the court declined to conduct an analysis on the merits of either of those arguments. The defendant had forfeited both claims by failing to object to either the testimony or the State's closing argument. *Id.* at 475. The court found that neither prong of plain error saved the defendant from forfeiture. *Id.* at 475-76. Ultimately, the question the court answered was whether the defendant's forfeiture could be excused on the ground that counsel had performed ineffectively, and the court concluded that counsel had performed effectively. *Id.* at 476-77. Questions of ineffective assistance of counsel *are* reviewed *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 27. Reading *Graham*, therefore, provides no clarity as to whether it applied a *de novo* standard of review to the prosecutorial misconduct claims—claims it did not decide—or to the ultimate ineffective assistance claim that it did decide.

¶ 53　　Assuming that *Graham* was applying a *de novo* standard of review to the prosecutorial misconduct claim, it would be the last link in a remarkably brief chain of precedent. The case on which *Graham* relied for its finding of a *de novo* standard of review had nothing to do with claims of prosecutorial misconduct. See *People v. Carlson*, 185 Ill. 2d 546, 551 (1999). Rather, that case raised the question of whether the trial court erred in denying a defendant's motion to suppress evidence. *Id.* Again, like claims of ineffective assistance of counsel, the determination of whether suppression is warranted presents a question of law requiring *de novo* review. *People v. Colyar*, 2013 IL 111835, ¶ 24. The ultimate source of *Wheeler*'s conclusion about the standard of review involved a case examining a distinct substantive area of law.

¶ 54　　We conclude that *Blue*, applying an abuse of discretion standard to claims of prosecutorial misconduct in closing argument, properly invoked over a century of Illinois Supreme Court precedent. *Wheeler*, applying a *de novo* standard of review, imported that standard with no explanation from cases that are either unclear or that analyze dissimilar claims. We follow *Blue* and review claims of prosecutorial misconduct in closing arguments under the abuse of discretion standard.

¶ 55　　　　　　　　　　　　　Misstatement of Evidence

¶ 56　　Phagan first claims that the prosecutor misstated the evidence in closing argument by saying "[t]he defendant is literally caught at 3001 South King Drive in the stolen vehicle with

- 9 -

the smoking gun." While a prosecutor has wide latitude to make closing arguments, those arguments cannot be based on a misstatement of the evidence. *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 18. A single misstatement does not necessarily deprive a defendant of a fair trial unless the remark " 'result[s] in substantial prejudice to the defendant and constitute[s] a material factor in his conviction.' " *Id.* (quoting *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004)).

¶ 57    The parties' dispute centers on competing readings of *Jackson*, and we find resolving their dispute resolves this issue. In *Jackson*, the defendant was convicted of aggravated unlawful use of a weapon, which required the police to prove that he knowingly possessed a firearm. *Id.* ¶¶ 1, 19. Officers pulled Jackson over for a traffic stop, and one of them saw a bag of cannabis in the center console. *Id.* ¶ 6. When they asked Jackson to step out of the car, Jackson "made an aggressive, quick motion," started the car, and tried to put it in drive. *Id.* ¶ 9. The officers ordered him out of the car again, and after he and the passenger complied, they found a gun on the driver's side of the car under the floor mat along with a larger bag of cannabis. *Id.* ¶¶ 7, 10. Jackson testified that he did not know about the gun in his car and had never seen it there. *Id.* ¶ 13. During rebuttal, the prosecutor argued that in " 'Defendant['s] own words, he told the officers he found a gun in his car.' " *Id.* ¶ 18.

¶ 58    The court found the prosecutor's argument to be an obvious misstatement of the evidence, seeing as the defendant had repeatedly *denied* knowing about the gun in his car. *Id.* ¶¶ 17, 20. The court went on to find prejudice because the question at the heart of Jackson's case was not only whether a gun was in the car but whether Jackson knew about it. *Id.* ¶¶ 19-20. The only evidence of knowledge was circumstantial evidence based on the officer's testimony that Jackson had turned his car back on and tried to put it in drive. *Id.* ¶ 19. That testimony was disputed too. *Id.* In short, no direct or physical evidence showed that Jackson knew the gun was in his car. *Id.* ¶¶ 17, 20.

¶ 59    Phagan and the State initially dispute whether the prosecutor actually misstated the evidence. *Jackson* guides us because there the prosecutor made a claim (the defendant confessed to knowing about the gun) that was directly contradictory to the defendant's testimony and his entire theory of the case (he did not know about the gun). *Id.* ¶¶ 19-20. Here, the alleged inaccuracy is less clear. As the State points out, citing Merriam Webster's online dictionary, the term "smoking gun" carries a widely known colloquial meaning. Indeed the only definitions of the phrase provided are "something that serves as conclusive evidence or proof (as of a crime or scientific theory)" or "a piece of evidence that clearly proves who did something or shows how something happened." See Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/smoking%20gun (last visited Apr. 18, 2019) [https://perma.cc/NLY9-J7WD].

¶ 60    We are not persuaded by Phagan's argument that the prosecutor misstated the evidence because the gun was not currently hot or issuing smoke when the officers discovered it. The jurors heard the testimony about the points during the chase at which the driver fired the gun. They were well aware that the driver was not observed firing the gun immediately before the chase ended. The plain meaning of the prosecutor's argument, under any reasonable interpretation, was figurative: the police officers found a gun at the feet of the driver's seat in the van where, several moments before, the driver was seen firing a gun. Based on the evidence presented, the State was entitled to argue to the jury that the discovery of the gun was

"conclusive evidence or proof" of the officers' testimony that they had seen the driver of the van fire the gun.

¶ 61    Even if we were to find that the prosecutor misstated the evidence by using the phrase "smoking gun," we would not find any prejudice like the court did in *Jackson*. Unlike the court in *Jackson*, we are not evaluating proof of a subjective mental state that can only be shown by circumstantial evidence. The prosecutor's argument spoke to one question: Did Phagan fire the gun found in his car? Multiple witnesses testified that they saw the driver of the van shoot at them. Officer Pantano even testified that, at the time the driver shot at him and Officer Carroll, he could see the driver, whom he identified as Phagan. Additionally, even if the witnesses who saw the driver fire a gun could not see his face, it is undisputed that only Phagan occupied the van during the chase.

¶ 62    Additionally, unlike *Jackson*, we are not confronted with a complete lack of physical evidence surrounding the disputed remark. Illinois State Police analyst Ellen Chapman testified that she found gunshot residue from the driver area. She also found gunshot residue on Phagan's white short-sleeved T-shirt. We acknowledge that Chapman testified that the presence of gunshot residue does not necessarily mean the person came in contact with it by firing a gun. But the gunshot residue testimony must be taken in conjunction with the facts that officers saw the driver firing the gun and it is undisputed that Phagan was the driver.

¶ 63    The gun was not literally smoking; it was "smoking gun" evidence, and we find no error. Regardless, any error that may exist would not have prejudiced Phagan.


¶ 64                                                    Bolstering

¶ 65    Phagan next argues that the prosecutor committed misconduct by improperly bolstering the credibility of the State's witnesses. During rebuttal the State argued, referring to the police officers: "They're just doing their job. They're out there serving and protecting. We ask them to do that. We need the police." According to Phagan, the prosecutor's argument "attempted to bolster the credibility of the State's witnesses based solely on their status as officers, resulting in grave prejudice to Phagan, as the entire case hinged on the jury's credibility determinations."

¶ 66    The State counters that the prosecutor did not bolster its witnesses because the prosecutor did not inject personal beliefs and instead "made benign, accurate, common knowledge statements about the job of police officers." As an alternative argument, the State says that the defense counsel's argument "provoked or invited" the prosecutor's rebuttal.

¶ 67    The hallmark of improper bolstering involves an expression of a prosecutor's personal belief in the credibility of a witness. See *People v. Rogers*, 172 Ill. App. 3d 471, 476 (1988); *People v. Townsend*, 136 Ill. App. 3d 385, 394 (1985) (improper to "place[ ] the weight of the State's Attorney's office behind the credibility of the State's witnesses"). Even where a prosecutor does not explicitly state his or her personal beliefs about witness credibility, "repeated references to [a witness's] status as a police officer and a sworn deputy" nonetheless can amount to improper bolstering. See *People v. Ford*, 113 Ill. App. 3d 659, 662 (1983).

¶ 68    Phagan argues that the prosecutor's comments during rebuttal were "very similar to those that were found to be reversible error in *Ford* and *Rogers*." We disagree. In *Ford* the prosecutor compared one of the officers involved to the defendant, describing the officer as a person " 'of impecable [*sic*] credentials' " and the defendant as a person who " 'her own community didn't

trust.' " *Id.* at 661. The prosecutor went on to ask the jury, " 'Why would [the officer], a sworn Warren County Deputy, pull a charade like this and lie and perjure herself for a lousy 15 gram purchase of marijuana?' " *Id.* at 662. The court found these comments "exceeded the boundaries of proper argument." *Id.* The prosecutor in *Ford* directly linked the witness's status as an officer and her credibility.

¶ 69    The prosecutor went further in *Rogers*, arguing, " 'What can I say about [the officers], seasoned veterans on the police force. Credibility untouchable. Important testimony.' " 172 Ill. App. 3d at 476. Again, like in *Ford*, the prosecutor in *Rogers* directly linked the witnesses' status as officers with their credibility: " 'You take all the evidence in consideration and look at the testimony of the witnesses and believe me you look at [the officers] and they won't get on the stand and lie and make up something.' " *Id.* at 477. "[T]aken in context," according to the opinion, the State had improperly attempted to inject its personal views about the credibility of its officer witnesses. *Id.*

¶ 70    When we view the prosecutor's statements in Phagan's case, particularly when we view them in context, we do not find similar error. The entire paragraph of transcript containing the disputed statements reads:

> "The pursuit is fluid. The officers see different things at different times. Everybody sees different things at different times. Wouldn't it be suspect if it was all exactly the same, if everybody saw the same thing[?] They're just doing their job. They're out there serving and protecting. We ask them to do that. We need the police."

In context, the prosecutor appears to be attempting to explain the reason that officers would testify with slight variations even though they viewed the same event. We cannot say, in light of the guidance offered by *Rogers* and *Ford*, that the prosecutor's comments amount to improper bolstering. We do not, however, share the State's view that these comments embody entirely "benign, accurate, common knowledge statements about the job of police officers." In particular, the addition of "[w]e ask them to do that" and "[w]e need the police" to the end of this portion of the argument carries the risk of implying to the jury that they should take the officers' testimony more seriously because officers perform critical societal functions.

¶ 71    While we could say that the prosecutor's comments verged on the improper when read on their own, we also agree with the State that defense counsel's argument invited the remarks. See, *e.g.*, *People v. Vargas*, 409 Ill. App. 3d 790, 797 (2011) ("prosecutor's remarks on rebuttal will not be deemed improper where the record reveals they were the product of defense counsel's provocation or invitation"). Defense counsel's theme sought to demonstrate the officers only said that there were shots fired from the van to justify their own decisions to shoot their weapons. When referring to the shots fired by Officers Taylor and Akinbusuyi, counsel argued that "you got to say that you see something in order to justify these actions" and went on to argue, "[the officers] don't see any muzzle flashes from the van. They don't see any flashes of light. But they're firing away because you got to justify your actions." Immediately after that argument, this time referring to Officer New, counsel argued he heard shots fired and "when [he] saw the van, [he] fired off a shot. Got to justify [his] actions. Got to say something." Counsel rounded out the argument: "Basically when they're [*sic*] shots fired, and the officers get into position pretty much have a green light to fire shots and that's what it comes down to."

¶ 72    Phagan's counsel's entire characterization of the officers' testimony sought to convey that the officers only testified as to what they saw and that they heard shots from the van to justify

the shots they took; in other words, the officers lied to avoid getting in trouble for shooting at the van.

¶ 73     In light of defense counsel's characterization of the officers' testimony, we do not find statements like "[t]hey're out there serving and protecting," "[w]e ask them to do that," and "[w]e need the police," to establish improper bolstering. If anything, the State engaged in an attempt to rehabilitate the officers after defense counsel strongly implied that they lied to save themselves from some kind of liability. More importantly, we find that overruling Phagan's objection to this line of argument was not an abuse of discretion.

¶ 74                                          Phagan's Credibility

¶ 75     Phagan maintains that the prosecutor improperly "attack[ed]" Phagan's credibility by arguing, "it's ridiculous what [Phagan] told you. Don't believe it for a second. He has so much to lose. That's why he's doing it." In particular, Phagan claims that these remarks referenced his possible punishment, which a prosecutor cannot do. See *People v. Cisewski*, 118 Ill. 2d 163, 177 (1987). The State initially responds that the claim has been forfeited, having not been specifically listed in the posttrial motion. The State goes on to argue that the claim fails on the merits because the prosecutor may permissibly comment on any witness's credibility, even the defendant's when the defendant chooses to testify. See *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000) ("State may challenge a defendant's credibility and the credibility of his theory of defense in closing argument when there is evidence to support such a challenge").

¶ 76     We agree with the State that Phagan forfeited this argument by failing to include it in his posttrial motion. To preserve an issue for review, a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). In terms of claims about prosecutorial misconduct in argument, a defendant must include each claimed error in the posttrial motion not just a general claim of misconduct. See *Love*, 377 Ill. App. 3d at 312-13 (distinguishing between alleged errors that were and were not included in defendant's posttrial motion). Defense counsel certainly objected to the State's comments about Phagan's credibility during the rebuttal argument, but those comments are not claimed errors in the motion for a new trial. Strictly applying *Enoch*, Phagan's claim has been forfeited.

¶ 77     We could excuse Phagan's forfeiture and consider this claim on the merits (see *People v. Perry*, 2014 IL App (1st) 122584, ¶ 20 (forfeiture a limit on parties, not court)), but defense counsel on appeal does not use his reply brief to respond to the State's forfeiture argument or contend that there are any grounds on which we could excuse his forfeiture. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (proper to raise plain error for first time in reply brief). At a minimum, counsel has forfeited any response to the State's forfeiture argument. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Because trial counsel's failure to include this claim in Phagan's posttrial motion results in forfeiture and because appellate counsel does not ask us to excuse that forfeiture, we decline to address this claim on the merits.

¶ 78     In sum, the trial court did not abuse its discretion when it overruled Phagan's objections to the prosecutor's arguments about "smoking gun" evidence and the officers' motives for testifying. Phagan's claim that the prosecutor improperly disparaged his testimony has been forfeited and counsel makes no argument that we can review that claim for plain error. Finding no error in the prosecutor's argument, we affirm Phagan's convictions.

¶ 80        Phagan goes on to mount several attacks on his sentence, first claiming that the 20-year firearm add-on imposed on his sentence for attempted murder of a peace officer does not apply to that offense. The statute defining attempt offenses in Illinois contains a separate provision outlining specific sentencing requirements for attempted first degree murder. As a baseline, the statute requires attempted first degree murder to be sentenced as a Class X offense, carrying a sentencing range of 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014).

¶ 81        If the victim is a peace officer, the statute extends the sentencing range to 20 to 80 years. 720 ILCS 5/8-4(c)(1)(A); 9-1(b)(1) (West 2014). If the defendant personally discharges a firearm during the commission of the offense, the statute requires the imposition of an additional 20 years. *Id.* § 8-4(c)(1)(C).

¶ 82        Phagan argues that the 20-year enhancement for personally discharging a firearm does not apply to his conviction for attempted first degree murder of a peace officer because the plain language of the attempt statute only allows the court to impose one enhancement or the other, not both. Phagan relies on a decision of this court, *People v. Douglas*, 371 Ill. App. 3d 21, 26 (2007), which held that once a court applies the status-based enhancement in subsection (A), it cannot apply any of the others. Phagan acknowledges that, since *Douglas*, two other panels of this court have rejected it and held that both the status-based and firearm-based enhancements can be applied to a single sentence. *People v. Smith*, 2012 IL App (1st) 102354, ¶¶ 107-16; *People v. Tolentino*, 409 Ill. App. 3d 598, 603-06 (2011). He asks us to depart from those decisions.

¶ 83        The State asks that we follow *Smith* and *Tolentino* and find that the plain language of the statute allows for imposing both the status-based and firearm-based enhancements to attempted first degree murder. According to the State, no language in the statute indicates that these enhancements are mutually exclusive, and applying both keeps with the General Assembly's intent to punish offenses more harshly when the offender uses a gun.

¶ 84        Before the filing of the State's brief and Phagan's reply brief, another panel of this court weighed in. The court in *People v. Jackson*, 2018 IL App (1st) 150487, joined *Smith* and *Tolentino* to reject the reasoning in *Douglas*. We disagree with the conclusion in *Jackson* because we find its statutory analysis to be incomplete. We also disagree with the conclusions in *Smith* and *Tolentino* because both cases analyzed the statute as it existed before the General Assembly made a consequential amendment.

¶ 85        We agree with the court's conclusion in *Douglas*, though for different reasons. We hold that the plain language of section 8-4(c)(1) of the attempt statute does not allow for imposing more than one of the exceptions in subsections (A) through (E). Therefore, we vacate the application of the 20-year firearm enhancement in subsection (C) to Phagan's sentence for attempted first degree murder.

¶ 86        We begin our analysis with a significant point that the parties do not dispute: the statutory subsections are sentencing enhancements and do not lay out unique elements for separate offenses. We pause to explain our agreement with that proposition due to *Douglas*, on which Phagan relies, possibly suggesting that the enhancements are elements of unique offenses. In *Douglas*, the court discussed the legislative purpose behind the enhancements for attempted murder of a peace officer and described the General Assembly's enactment as "creating a Class X offense carrying 20 to 80 years" and said that subsections (B), (C), and (D) are "each a

different offense." 371 Ill. App. 3d at 26. To the extent the court in *Douglas* meant to advance this interpretation, we conclude the decision is incorrect.

¶ 87    As a general rule, if a statute lays out the elements of a criminal offense and then separately provides sentencing classifications based on other factors, those additional factors do not create new offenses. *People v. Owens*, 2016 IL App (4th) 140090, ¶ 33 (citing *People v. Van Schoyck*, 232 Ill. 2d 330, 337 (2009)). Instead, those additional factors serve only to enhance the ultimate punishment. *Id.* The attempt statute expressly sets out the elements of the offense under a heading bearing that specific language. See 720 ILCS 5/8-4(a) (West 2014) ("Elements of the offense."). Then the separate factors are laid out in a subsection labeled "Sentence." See *id.* § 8-4(c). The structure of the statute makes plain that we are dealing, not with separate offenses, but with additional factors that provide exceptions to the general Class X sentence imposed for attempted first degree murder.

¶ 88    We are mindful that, under *Apprendi v. New Jersey*, 530 U.S. 466, 495 (2000), labeling an additional factor an "enhancement" does not diminish the State's burden to prove that factor beyond a reasonable doubt. But the General Assembly has accounted for this constitutional rule and has placed strict limits on the ability to charge and obtain a conviction based on nonelement sentencing enhancements. The Code of Criminal Procedure provides that, where the State alleges a nonelement fact that increases the range of penalties beyond the statutory maximum that could otherwise be imposed, the State must notify the defendant before trial, submit the enhancement to the fact finder, and prove it beyond a reasonable doubt. 725 ILCS 5/111-3(c-5) (West 2014).

¶ 89    Here, the State both amended the indictment and submitted a written motion seeking the relevant enhancements. The jury instructions included the victims' status as peace officers as propositions that the State had to prove, and the State submitted special jury questions regarding the proof of personal discharge of a firearm beyond a reasonable doubt. Thus, we are presented with nonelement sentencing enhancements that have been proven in a manner consistent with the constitutional rule of *Apprendi*. Cf. *Jackson*, 2018 IL App (1st) 150487, ¶¶ 55-59.

¶ 90    Turning to whether both enhancements can apply to attempted first degree murder, we are confronted with a question of statutory interpretation. Our objective in construing a statute is to give effect to the General Assembly's intent, which we do by looking to the language in the statute and ascribing its plain and ordinary meaning. *Id.* ¶ 48. Unless the language of the statute is ambiguous, we do not resort to extrinsic aids of statutory construction. *Id.* (citing *People v. Glisson*, 202 Ill. 2d 499, 505 (2002)). We employ the *de novo* standard of review when construing a statute. *Id.* ¶ 47.

¶ 91    The sentencing provision of the attempt statute, section 8-4(c)(1), states:

"(c) Sentence.

A person convicted of attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A-2 of this Code:

(1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that

(A) an attempt to commit first degree murder when at least one of the aggravating factors specified in paragraphs (1), (2), and (12) of subsection (b)

- 15 -

of Section 9-1 is present is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court; and

(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" 720 ILCS 5/8-4(c)(1)(A)-(E) (West 2014).

¶ 92    As we have alluded to, the bulk of the relevant cases provide little help because they were not confronted with the applicable text. The statute's 2010 amendments changed the period at the end of subsection (D) into a semicolon and added everything from "and" to the end of subsection (E). Pub. Act 96-710 (eff. Jan. 1, 2010) (amending 720 ILCS 5/8-4). *Douglas*, decided in 2007, interpreted the version of the statute in effect in 2000. 371 Ill. App. 3d at 26. *Smith* and *Tolentino*, decided in 2012 and 2011 respectively, also interpreted versions of the statute in effect before the amendment. See *Smith*, 2012 IL App (1st) 102354, ¶ 107 (citing 720 ILCS 5/8-4(c) (West 2004)); *Tolentino*, 409 Ill. App. 3d at 604 (citing 720 ILCS 5/8-4(c) (West 2006)). Only one case, which neither party cites but was addressed during oral argument, interprets the postamendment version—*Jackson*, 2018 IL App (1st) 150487, ¶ 49 (citing 720 ILCS 5/8-4(c) (West 2010)). We will, accordingly, begin our analysis with *Jackson* although, as we will explain, that analysis only gets us so far.

¶ 93    *Jackson* points to section 8-4(c) as stating a general rule: attempted first degree murder is a Class X offense carrying a sentencing range of 6 to 30 years in prison. *Id.* ¶ 50. The statute then goes on to list exceptions, beginning with subsection (A), which allows for an enhanced sentencing range of 20 to 80 years when the victim is, among others, a peace officer. *Id.* *Jackson*'s analysis focuses on what comes next: a semicolon. Because a series of subsections punctuated by semicolons follow subsection (A), ordinary principles of grammar would suggest that these are "related but separate concept[s]." *Id.* ¶ 51. Ordinarily this means we would read subsections (A) through (E) disjunctively, that is, only one could apply at a time. *Id.*

¶ 94    *Jackson* went on to find that the "and" transition from subsection (D) to subsection (E) disrupted the usual inference that we would derive from a semicolon. *Id.* The court reasoned that, by inserting "and" at the end of a list punctuated by semicolons, the General Assembly expressed an intent that the subsections apply conjunctively, meaning that more than one can

apply to a given defendant at a given time. *Id.* The court in *Jackson* found this to be a natural reading because subsections (B) through (D) add a term of years onto the new sentencing range required when subsection (A) applies. *Id.* ¶ 52.

¶ 95    Absent from the analysis in *Jackson* (and from the parties' briefs before us) is a discussion of the effect of the addition of subsection (E) on the analysis. Certainly, we must interpret statutes to give every section its intended effect. *People v. Stoecker*, 2014 IL 115756, ¶ 25 ("every clause of a statute must be given a reasonable meaning, if possible, and should not be rendered meaningless or superfluous"). Additionally, we interpret statutes as a whole, rejecting an interpretation that exalts one provision of a statutory scheme over another. *People v. Miles*, 2017 IL App (1st) 132719, ¶ 25 ("When interpreting a statute, we do not read a portion of it in isolation; instead, we read it in its entirety, keeping in mind the subject it addresses and the drafters' apparent objective in enacting it."). When we adhere to these principles and take account of subsection (E), reading these provisions conjunctively, as the court did in *Jackson*, brings about an unworkable result.

¶ 96    Subsection (E) borrows language that is "substantially similar to the statutory language for one of the grounds for second degree murder." *People v. Lauderdale*, 2012 IL App (1st) 100939, ¶ 23 (citing 720 ILCS 5/9-2(a)(1) (West 2010)). Because the court in *Lauderdale* found that the defendant had failed to prove the existence of facts justifying mitigation under subsection (E), the court expressly declined to decide whether the 25-year firearm enhancement in subsection (D) could be applied if the mitigating circumstances in subsection (E) also were found. *Id.* ¶ 35.

¶ 97    We are aware that our supreme court has said, "under the Illinois attempt statute, no crime of attempted second degree murder exists." *People v. Lopez*, 166 Ill. 2d 441, 451 (1995). As we have said, subsections (A) through (E) do not create new offenses; they provide exceptions to the default Class X sentencing range for attempted first degree murder. That said, we examine the differences between first and second degree murder to further our understanding of the relationship between subsections (A) through (E) in the attempt statute.

¶ 98    Under our law, while it is listed in its own statute, Illinois has no separate offense of second degree murder. See *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995) (second degree murder is not lesser-included offense of first degree murder but, rather, a lesser-mitigated offense of first degree murder). In other words, finding a defendant guilty of second degree murder means he or she must have committed acts that establish every element of first degree murder. *Lopez*, 166 Ill. 2d at 447. Then, once the State has proven the elements of first degree murder, the defendant has the opportunity to prove one of two mitigating circumstances by a preponderance of the evidence. *Id.*; see also 720 ILCS 5/9-2(a)(1)-(2) (West 2014). By its plain terms, the statute codifying second degree murder only allows a defendant to present mitigating circumstances if he or she allegedly committed nonaggravated first degree murder. See 720 ILCS 5/9-2(a) (West 2014) (citing *id.* § 9-1(a)(1)-(2)). Hence, there cannot be, for instance, second degree murder of a peace officer.

¶ 99    With these base principles in mind, we turn to the sentencing exceptions in section 8-4(c)(1)(A) through (E). To receive the enhancement for attempted murder of a peace officer, the defendant must attempt an act that, if he or she had succeeded, would be first degree murder of a peace officer. See *id.* §§ 8-4(c)(1)(A); 9-1(b)(1). To receive the mitigation of a Class 1 sentence based on serious provocation, the defendant must have attempted an act that, if he or she had succeeded, would have been second degree murder (first degree plus a mitigating

circumstance). See *id.* § 8-4(c)(1)(E). These two exceptions to the base Class X sentencing range for attempted first degree murder cannot exist together because, if the defendant attempted the aggravated form of first degree murder, the defendant cannot also have attempted first degree murder plus a mitigating circumstance. We know this because, as we have explained, the mitigating circumstances that allow for a second degree murder conviction do not apply to the aggravated versions of first degree murder.

¶ 100  *Jackson* relied on the word "and" to support its conjunctive interpretation of the subsections without taking account of what came after the "and." One simply cannot read subsection (A) and subsection (E) conjunctively. Applying the conjunctive reading proposed in *Jackson* to the remainder of the subsections would require us to acquiesce in an impossible reading of the statutory scheme as a whole, an absurd result we are obligated to avoid. See *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010) (we presume legislature did not intend absurd results).

¶ 101  Accounting for subsection (E), as we must, leads to absurd results. But reading the statute conjunctively leads to another absurdity that existed even before the amendment of the attempt statute. Phagan points out that reading the subsections conjunctively would allow the trial court to impose the 15-year, 20-year, and 25-year enhancements in subsections (B), (C), and (D) respectively, on top of each other as long as the State proved the factual predicate for the most serious of the three. In *Jackson*, the court dismissed this concern as "unfounded" because of the rule that the court is to interpret statutes so as to prohibit multiple enhancements absent clear legislative intent to the contrary. 2018 IL App (1st) 150487, ¶ 53. We cannot reconcile this assurance with *Jackson*'s finding of a clear legislative intent to read the statute conjunctively. It cannot both be true that the legislature wanted the subsections to apply conjunctively, which would require the imposition of every subsection that applied, but at the same time did not intend multiple enhancements.

¶ 102  The State's attempt to save this reading of the statute fares no better. In contrast to *Jackson*, at oral argument the State embraced the multiple-enhancement interpretation and assured us that trial courts simply are not sentencing defendants under every enhancement that applies. We have similarly been unable to find any case in which a court has applied more than one of the enhancements in subsections (B) through (D). But the State's assurance that trial courts are not applying these enhancements on top of one another raises another interpretive problem: the enhancements under subsections (B) through (D) are mandatory. Each subsection states that the term of years "*shall* be added" if the trial court finds the requisite facts. If subsections (B) through (D) are to be read conjunctively and the imposition of each subsection to be mandatory, then trial courts (or at least the trial court in this case) are acting contrary to the mandates of the statute.

¶ 103  We have explained the problems a conjunctive interpretation of the statute poses. It is impossible to read subsection (A) and subsection (E) conjunctively because the attempt offense described in each subsection cannot both have been committed by the same person at the same time. We cannot read subsections (B) through (D) conjunctively because doing so appears to sanction an unintended multiple enhancement. Both problems are at once solved by a disjunctive reading of subsections (A) through (E).

¶ 104  Further support comes from the statutory amendment. *Douglas* was the only opinion interpreting the former version of section 8-4(c). When we interpret amended statutes, we presume that the General Assembly knows of appellate and supreme court decisions interpreting those statutes at the time of the amendment. *People v. Gliniewicz*, 2018 IL App

(2d) 170490, ¶ 38. If the legislature leaves the statute unchanged in spite of our decision, we presume that the legislators acquiesced in our interpretation. See *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 458-59 (1997). Other provisions of the Criminal Code of 2012 demonstrate the General Assembly's ability to make the compound application of status- and firearm-based enhancements unmistakable. For example, the aggravated assault offense delineates separate offenses based on the location of the offense (720 ILCS 5/12-2(a) (West 2014)), based on victim status (*id.* § 12-2(b)(1)-(10)), and based on the use of a firearm (*id.* § 12-2(c)(1)-(9)). The sentencing provision then sets out separate classes of offense for each enumerated subsection. *Id.* § 12-2(d). That provision further provides additional enhancements for certain status-based offenses when a Category I, II, or III weapon is used. *Id.* The General Assembly, through this statutory scheme, makes plain that the status and weapon aggravating factors are distinct, going on to include separate subsections where it obviously intends enhancements to be based on the use of a weapon and victim status combined.

¶ 105    Another example, slightly more analogous, involves the statute criminalizing predatory criminal sexual assault of a child. See *id.* § 11-1.40. There, the legislature set out specific elements that create the offense. *Id.* § 11-1.40(a)(1)-(2). The first element depends purely on the child's age. *Id.* § 11-1.40(a). The second element is based on the age of the child and then nests within it certain additional factors, including the presence or discharge of a firearm. *Id.* § 11-1.40(a)(2)(A)-(B). Then, in the sentencing section, the statute delineates distinct sentencing ranges and enhancements for each subsection.

¶ 106    These statutory provisions provide evidence that the General Assembly has the ability to impose status-plus-firearm enhancements when it intends to do so. We cannot read that intent here, however, particularly when we must presume the legislature was aware of *Douglas* when it amended the attempt statute. The General Assembly could have easily expressed its intent to interpret the statute in the way the State would like by nesting subsections (B) through (D) under subsection (A), but it chose not to. If this is the reading the legislature intended, the General Assembly should amend the statute to make that clear.

¶ 107    We find that the attempted first degree murder statute found in section 8-4(c)(1)(A)-(E), as it is currently written, does not allow for the imposition of the 20- to 80-year extended sentencing range combined with the 20-year firearm enhancement. See *id.* § 8-4(c)(1)(A)-(E).

¶ 108                                          Remedy

¶ 109    Phagan argues that we should "either vacate the 20-year sentencing enhancements or remand this cause for resentencing." The State takes no position on remedy, simply asking us to affirm. While Phagan does not cite any authority or offer any explanation as to why we would vacate the firearm enhancement as opposed to the peace officer enhancement, we agree that vacating the 20-year firearm enhancement is the proper course.

¶ 110    We have found no authority directly on point in the context of sentencing enhancements, but the law is well settled in the analogous context of one-act, one-crime violations. Our supreme court has "always held" that, when the entry of two convictions violates the one-act, one-crime rule, the less serious offense must be vacated. *People v. Lee*, 213 Ill. 2d 218, 226-27 (2004). We are permitted to make that determination for ourselves, without remand to the trial court, when we are able to determine the more serious offense. *People v. Grant*, 2017 IL App (1st) 142956, ¶ 33. In the one-act, one-crime context, we determine the more serious offense by looking at the possible punishments—the greater the penalty, the more serious the

- 19 -

offense. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). If the punishments are identical, we can also look to the mental state required—the more culpable the mental state, the more serious the offense. *Id.* at 170-71.

¶ 111　　These principles are easily applicable to Phagan's case, even though we are dealing with sentencing enhancements, not separate offenses. The peace officer sentencing enhancement increases the sentencing range from 6-30 years to 20-80 years. 720 ILCS 5/8-4(c)(1)(A), 9-1(b)(1) (West 2014). The firearm enhancement, applied separately as we now hold it must be, increases the sentencing range from 6-30 years to 26-50 years. See *id.* § 8-4(c)(1)(C) (adding 20 years to base Class X range). The peace officer sentencing enhancement increases the possible penalty far beyond the firearm sentencing enhancement and appears to be the enhancement the General Assembly viewed as the more serious.

¶ 112　　We go on to analyze the *mens rea* for each enhancement, however, because of the substantial overlap between the two sentencing ranges. The firearm sentencing enhancement, by its plain text, imposes no additional mental state requirement beyond the base attempted murder offense. It is enough that the defendant committed attempted murder while discharging a firearm. The peace officer enhancement, on its own terms, also does not add a mental state requirement. But the peace officer enhancement does directly cross-reference to the underlying offense. See *id.* § 8-4(c)(1)(A) (citing *id.* § 9-1(b)(1)). The underlying offense requires the defendant to have knowledge that the victim was a peace officer. *Id.* § 9-1(b)(1). So we know that a defendant who attempts to murder a peace officer must know that he is attempting to murder a peace officer. We conclude that the peace officer enhancement requires a more culpable *mens rea* than the firearm enhancement.

¶ 113　　Because the firearm enhancement is the less serious enhancement, based both on the possible penalties associated with it and the lesser mental state required, we vacate the trial court's imposition of the 20-year firearm enhancement.

Discretionary Consecutive Sentences

¶ 115　　Phagan argues that the trial court erred by ordering his sentence for attempted murder to run consecutively to his other concurrent sentences. He argues that the independently lengthy prison terms are sufficient to protect the public because, despite his criminal background, this case did not result in any injuries or damage. The State responds that the trial court properly found that Phagan's conviction for a 2008 case was "eerily similar" to this one and that Phagan put numerous lives at risk by his conduct, making a consecutive sentence necessary to protect the public. We agree with the State and find, given the extreme danger caused by Phagan's conduct and his apparent penchant to be involved in this kind of behavior, the trial court did not abuse its discretion by imposing consecutive sentences.

¶ 116　　The Unified Code of Corrections allows for the imposition of discretionary consecutive sentences where, "having regard to the nature and circumstances of the offense and the history and character of the defendant," the court believes that consecutive sentences "protect the public from further criminal conduct by the defendant." 730 ILCS 5/5-8-4(c)(1) (West 2014). Consecutive sentences should be imposed in exceptional cases, and the record must show that the trial court has adequately balanced mitigating factors and rehabilitative potential against the need to protect the public. *People v. O'Neal*, 125 Ill. 2d 291, 298-301 (1988); see also *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36. Given the fact-intensive balancing required from the trial court, we follow an abuse of discretion standard. *O'Neal*, 125 Ill. 2d at 297-98.

¶ 117    The trial court relied heavily on the danger to the public and the police caused by Phagan's behavior. The record supports this conclusion. Ample testimony attests to Phagan repeatedly driving over the speed limit, ignoring traffic control devices, and driving off-road. In pursuit, the officers also had to drive at high speeds and sometimes in the wrong lane of traffic. While it was early morning, and the videos of the chase show little traffic, the trial court correctly found that the chase posed a significant risk of danger to anyone in the vicinity, including Phagan and the pursuing officers. That would be danger enough, but Phagan compounded that danger by firing at the officers. In response, several officers fired at least 17 shots.

¶ 118    Even more significantly, the trial court found Phagan's actions to be both deliberate and likely to be repeated. The trial judge, when considering mitigation, rejected the idea that Phagan's conduct "did not contemplate" the possibility of serious physical harm to another. The court noted that at every turn Phagan could have made a choice to reduce the possibility of injury by complying with the police when they attempted to pull him over. Instead, he led a "high speed chase with basically shootouts at three different points." Phagan undoubtedly understood that he "could cause or threaten serious physical harm certainly to civilians that were around, as well as responding officers."

¶ 119    As we laid out in the facts, Phagan committed this offense while on mandatory supervised release (parole) for a 2008 offense that bears striking similarities. A Sauk Village police officer found Phagan and a codefendant in a car that had been stolen four days before. After unsuccessful efforts to arrest them, Phagan sped off, at times "[i]n excess of 110 miles an hour," driving erratically. The codefendant, the passenger, leaned out and fired at the pursuing officers causing one squad car to crash and another to abandon the pursuit. The trial court described this offense as "eerily similar" to this one, and we agree. Phagan has shown, twice now, complete disregard for the safety of the citizens of Chicago, the police, and himself. We find the trial court's judgment, that this aggravation is "incredibly, incredibly significant," to not be an abuse of discretion.

¶ 120    Phagan fails to identify any record facts that the trial court should have considered in mitigation and did not. Instead, he recites a series of Illinois cases reversing the imposition of consecutive sentences for "far more serious crimes" than his, including *O'Neal*, *People v. Rucker*, 260 Ill. App. 3d 659 (1994), and *People v. Brown*, 258 Ill. App. 3d 544 (1994). We find these cases distinguishable, each for slightly different reasons.

¶ 121    In *O'Neal*, the trial court ordered the murder sentence to run consecutively to the concurrent sentences for rape and aggravated kidnapping. 125 Ill. 2d at 293-94. The defendant and another offender had forced their way into victim's car. *Id.* at 294-95. They drove to an alley where they put the victim's boyfriend in the trunk and the defendant raped the victim. *Id.* at 295. After the defendant was done, the other offender got on top of the victim; the defendant then shot the other offender and fled. *Id.* The defendant was 19, the youngest of six children to a mother on public aid. *Id.* at 300. The defendant had left home while he was still in grammar school, and his only conviction had been a robbery for which he had received probation. *Id.* The defendant also testified that he was afraid of the other offender, who had previously forced him to participate in other crimes and to perform sexual acts at gunpoint. *Id.* at 296.

¶ 122    The Illinois Supreme Court affirmed the judgment of the appellate court reversing the imposition of consecutive sentences. *Id.* at 301. Central to its analysis was the determination that the trial court had considered the evidence in aggravation, but there was "no indication that the trial court gave serious consideration to [the] defendant's youth and other evidence in

- 21 -

mitigation, namely, his desire to free himself from [the other offender's] oppressive deviate sexual practices." *Id.* at 300. Phagan's sentencing hearing does not present us with the same deficiencies. The trial court went through the statutory mitigating factors and explained why each one did not apply. Of particular relevance, contrary to the court's reasoning in *O'Neal*, the trial court found that Phagan's conduct was not the result of provocation, inducement, or some other excuse. *O'Neal* presented an uncommon set of facts and a trial court unwilling to consider them; that is not Phagan's situation.

¶ 123    In *Rucker*, the trial court imposed consecutive sentences for two separate counts of armed robbery despite the presence of a deluge of mitigating evidence. There, the 17-year-old defendant and two of his friends placed orders for pizza. *Rucker*, 260 Ill. App. 3d at 660. Both times the same delivery person arrived. *Id.* The first time the boys brandished a metal pipe and took the pizza without paying; the second time, the boys hit the delivery person with baseball bats, causing a skull fracture and shattered elbow, and took money from him. *Id.* at 660-61. At sentencing the State argued the severity of the offense in aggravation. *Id.* In contrast, the mitigation evidence showed that the defendant had been a well-performing student until his grandmother died and his girlfriend broke up with him, at which point he was hospitalized for severe depression and never successfully treated. *Id.* at 661. The defendant, though he explained the offense as another boy's idea, expressed remorse and a willingness to pay restitution to the victim. *Id.* at 661-62.

¶ 124    The appellate court reversed the consecutive sentences, finding that, while a lengthy sentence was appropriate, consecutive sentences of 6 and 14 years was an abuse of discretion in light of the facts. *Id.* at 663. None of the mitigation present in *Rucker* exists here. Phagan was not a young boy, cajoled into crime by peer pressure. There is no evidence of trauma that would have caused a behavioral spiral. Similarly, because Phagan did not speak in allocution, there is no affirmative evidence that he expressed any remorse. Indeed, most of his trial testimony was nothing but an elaborate exercise in blame-shifting, and a futile one at that— the jury did not accept any of his excuses. We cannot say that *Rucker* supports reversal.

¶ 125    The court in *Brown* confronted a confluence of reasons to justify a reversal of consecutive sentences. The defendant had been convicted of aggravated criminal sexual assault, aggravated criminal sexual abuse, and armed robbery. *Brown*, 258 Ill. App. 3d at 545. As in *O'Neal*, the appellate court described the trial court's consecutive sentences decision as "boilerplate." *Id.* at 554. As in *Rucker*, significant mitigating evidence was presented, including that the defendant was 19, had no criminal history, had been employed, and lived with his family. *Id.* In addition, the defendant in *Brown* faced a different application of the consecutive sentencing statute. By the statute's text, his sentences for aggravated criminal sexual assault and armed robbery were required to run consecutively, and the defendant did not challenge that aspect of his sentence. *Id.* at 553. Those sentences alone amounted to 20 years. *Id.* at 554. The appellate court found it unnecessary to add an additional discretionary consecutive sentence of five years. *Id.* As before, we are not presented with significant mitigation or with a "boilerplate" ruling from the trial court or with sentences already running consecutively by operation of law.

¶ 126    The trial court's decision did not amount to an abuse of discretion. Phagan does not claim that the trial court failed to consider mitigating evidence. The trial court carefully considered the potential for harm caused by Phagan's conduct and, given Phagan's criminal history, the substantial likelihood that he might do something like this again. We agree that the record

supports the trial court's conclusion. We affirm the imposition of consecutive sentences.

¶ 127                           Excessiveness of Sentence

¶ 128       Phagan also challenges his sentence as excessive. We address this issue without remanding because, as we read Phagan's brief, we understand his challenge to be only to the concurrent 30-year sentences for attempted murder of a peace officer irrespective of his challenges to the 20-year firearm enhancement or the consecutive sentence in his other case. While Phagan's brief does complain about his "71-year aggregate sentence," the remedy he seeks is exclusively related to his 30-year attempted murder sentence. Specifically, he asks only that we "reduce [his] sentences for attempt[ed] first degree murder to the minimum of 20 years" or remand for resentencing. This task is the same regardless of our conclusions as to the other aspects of his sentence, so we undertake it now.

¶ 129       Phagan makes three basic arguments as to the excessiveness of his 30-year attempted murder sentences: (i) his sentence had no deterrence value because, as the trial court acknowledged, the case had not received "substantial visibility"; (ii) the sentence serves no rehabilitative purpose because Phagan had rehabilitative potential but received a *de facto* life sentence; and (iii) the trial court's sentence was disproportionate to the nature of the offense. The State responds to each claim, but the theme of the State's argument is that on balance the seriousness of Phagan's offense significantly outweighs any possible mitigation and justifies his sentence, which was within the applicable sentencing range. We ultimately agree with the State.

¶ 130       Phagan briefly reiterates the trial court's point that his sentence would not serve the interest in general deterrence because the case was not widely publicized. We note some courts have expressed doubt that publicity is a necessary component of general deterrence. See *United States v. Robinson*, 778 F.3d 515, 521 (6th Cir. 2015) ("A court should not require evidence of likely publicity before taking into account the Congressional sentencing goal of deterrence ***."). Indeed, general deterrence concerns maintaining the faith that our judicial system adequately punishes wrongdoing as much as it does about preventing others from committing the precise crime of which a defendant is convicted. *Cf. United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). It would be impossible to advance this goal if we consistently sanctioned relatively lenient punishment for serious offenses just because those cases did not achieve public infamy. We find that, even if Phagan's offense had not been widely known, his sentence demonstrates the trial court's commitment to punishing defendants sufficiently for bad acts and fosters a culture of deterrence that our system values.

¶ 131       Phagan further argues that he is "not beyond rehabilitation" because he was only 23 years old at the time of the offense, had a supportive family, had purportedly left the gang with which he had been involved, and had struggled with poverty and his mother's substance abuse. Defense counsel made these same arguments to the trial court. We presume that the trial court considered this evidence unless affirmative proof shows the contrary. *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55. The trial court expressly considered the statutory mitigating factor related to Phagan's attitude and likelihood to commit another crime as well as potential hardship to his family members caused by a long sentence. The existence of mitigating factors does not require the trial court to sentence close to the minimum. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010).

¶ 132     Despite the trial court's authority to substantially depart from the minimum—even with the existence of mitigating factors—the court did not do so for the base sentence for attempted murder. As a result, we cannot say that his sentence is "disproportionate to the nature of the offense," as Phagan argues. The permissible range for Phagan's sentence is 20 to 80 years. 720 ILCS 5/8-4(c)(1)(A) (West 2014). Phagan's base sentence is 10 years beyond the minimum and 50 years shy of the maximum. We have already set out, in great detail, the danger caused by Phagan's offense and his having committed similar offenses. Given the deference we owe to sentences within the statutory range (see *People v. Vega*, 2018 IL App (1st) 160619, ¶ 64), coupled with the trial court's careful consideration of the factors in aggravation and mitigation, we do not see a justification to disturb the trial court's sentencing judgment.

¶ 133     Affirmed in part and vacated in part.

¶ 134               **SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING**

¶ 135     Mr. Phagan has filed a *pro se* petition for rehearing. His arguments focus on our rejection of two of his claims of prosecutorial misconduct. He claims that we improperly characterized the State's argument about the "smoking gun" as a well-known figure of speech where earlier in the sentence counsel for the State used the word "literally." (Internal quotation marks omitted.) *Supra* ¶¶ 55-63. In other words, he asks us to read "literally" literally. He also claims that we improperly honored his forfeiture of his argument about the State's characterization of his credibility. *Supra* ¶¶ 74-78. As part of that argument, he suggests that his appellate counsel was ineffective for failing to address the State's forfeiture argument in the reply brief.

¶ 136     As to Phagan's first argument, he cites the dictionary definition of "literally" and urges us to find that any plain reading of the State's argument about the smoking gun could not be figurative. Again, the whole phrase the State said was, "[t]he defendant is literally caught at 3001 South King Drive in the stolen vehicle with the smoking gun." There is a grammatical ambiguity in this sentence. "Literally" could modify "caught at 3001 South King drive," but not the following prepositional phrases. Or "literally" could modify "caught at 3001 South King Drive in the stolen vehicle," but not "with the smoking gun." Both of these interpretations would be literally true in light of the trial evidence. Or as Phagan argues, "literally" could modify everything that follows it.

¶ 137     Our original opinion set out at some length that we review claims of prosecutorial misconduct for an abuse of discretion. Part of that review involves deference to the trial court's assessment of counsel's tone. Here, the emphasis the State placed on different words in the sentence could have provided some clue as to the contextual meaning of "literally." The trial court is also in the best position to gauge the impact of a particular argument in the context of the whole argument. Our discussion of the multiple permissible interpretations of the prosecutor's argument, when read on paper, is precisely why we vest the trial court with discretion to determine the propriety of counsel's arguments. In light of the standard of review and the inherent ambiguity in the State's one-sentence argument, we decline to modify our original holding.

¶ 138     We similarly reject Phagan's request to excuse his forfeiture of his claim about the prosecutor's comments on his credibility during closing argument for the reasons we have already stated. *Supra* ¶ 77. We will, however, briefly address his argument about ineffective

assistance of his appellate counsel for failing to argue plain error in reply. We typically do not allow litigants to raise new arguments in petitions for rehearing (Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)), but we have softened the requirement of compliance with this rule in appropriate circumstances. *People v. Patterson*, 2016 IL App (1st) 101573-B, ¶¶ 23, 27 (addressing two new arguments from State's petition for rehearing where they spoke to the court's jurisdiction and a conflict in precedent, respectively).

¶ 139       We could invoke Rule 341 and suggest to Phagan that he raise his claim of ineffective assistance of appellate counsel in a postconviction petition. See *People v. Veach*, 2017 IL 120649, ¶ 31 (collecting cases). In *Veach*, however, the Illinois Supreme Court instructed us that ineffectiveness claims are better suited to collateral proceedings *only* when "the record is incomplete or inadequate for resolving the claim." *Id.* ¶ 46. We can resolve Phagan's ineffective assistance of counsel claim easily on the record before us, and so judicial economy would be poorly served by sending him to postconviction proceedings to do so instead.

¶ 140       Ineffective assistance of appellate counsel claims are governed by the familiar standard in *Strickland v. Washington*, 466 U.S. 668 (1984), and require a defendant to show both that his counsel's performance was deficient and that the deficiency prejudiced the defendant. *People v. Golden*, 229 Ill. 2d 277, 283 (2008). In this context, "[u]nless the underlying issue has merit, a defendant cannot be considered to have suffered prejudice from appellate counsel's failure to brief the issue." *People v. Makiel*, 358 Ill. App. 3d 102, 113 (2005). We have already said that the underlying issue about the State's comments on Phagan's credibility were forfeited (*supra* ¶ 76), and so the alleged error must have amounted to plain error in order for us to find appellate counsel's failure to raise it prejudicial.

¶ 141       A defendant can show plain error in two ways. Under "first-prong" plain error, "a reviewing court must decide whether the defendant has shown that the error was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. Under this prong, a defendant must show that the error is prejudicial by demonstrating that the evidence is closely balanced. *Id.* Under "second-prong" plain error, we must also decide "whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process," but if the defendant makes that showing we presume prejudice regardless of the closeness of the evidence. *Id.* ¶ 50.

¶ 142       Under either prong of plain error we typically ask first whether there was clear or obvious error at all. *Id.* ¶ 49. But here, even assuming (without deciding) the prosecutor's argument was improper, neither prong of plain error would save Phagan from his forfeiture. As to the first prong, the evidence here was not closely balanced. Unlike *Sebby*, which turned on the resolution of a contest of credibility (*id.* ¶ 63), the State's case was corroborated by physical evidence. *Supra* ¶¶ 25-27. The court in *Sebby* cited its previous decision in *People v. Naylor*, 229 Ill. 2d 584 (2006), with approval where the court emphasized that first-prong plain error covers cases with " 'opposing versions of events' " but where there is " 'no extrinsic evidence *** to corroborate or contradict either version.' " *Sebby*, 2017 IL 119445, ¶ 63 (quoting *Naylor*, 229 Ill. 2d at 607). Here we have extrinsic evidence corroborating a host of State witnesses. The evidence was not closely balanced, and the prosecutor's error, assuming there was one, was not first-prong plain error.

¶ 143       Phagan has not explained how the prosecutor's passing comment about credibility amounts to second-prong plain error, and our review of the record does not reveal a trial that was unfair. We highlight that the State's attempt to downplay Phagan's credibility was not necessarily a

successful one. The jury found Phagan not guilty of several counts related to the chase overall and, more relevant to Phagan's testimony, not guilty of one of the counts related to the taking of Anthony Wilson's car. Whatever effect the prosecutor's argument had on the jury, it does not appear to have affected its ability to carefully and fairly weigh the evidence and decide on Phagan's guilt or lack thereof. Importantly, Phagan offers no concrete argument to the contrary.

¶ 144    We find that, even if it was error for the prosecutor to comment on Phagan's credibility, it was not plain error. Because it was not plain error, counsel's failure to argue that it was in the reply brief did not prejudice Phagan. We reject his argument of ineffective assistance of appellate counsel. We deny Phagan's petition for rehearing and, with the additions mentioned here, adhere to our original opinion.